## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

**IN RE:**

**STANLEY BOYD GREEN,**                     **CASE NO.  16-02105-5-SWH**
                                            **CHAPTER 13**

     **DEBTOR.**

### AMENDED MOTION TO DISMISS CASE FOR NON-COMPLIANCE WITH SECTION 109(e) AND BAD FAITH

COMES NOW Jennifer Joyner Cleland ("Movant"), by and through her undersigned counsel, and moves to dismiss the Debtor's chapter 13 case because (1) the Debtor's unsecured claims exceed the debt limits set by 11 U.S.C. § 109(e) such that the Debtor is not qualified to be a chapter 13 debtor; and (2) the Debtor filed this case in bad faith such that it is subject to dismissal under 11 U.S.C. 1307(c).  In support of this Motion, the Movant shows as follows:

### BACKGROUND

1.     On April 20, 2016 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 13 of the Bankruptcy Code.

2.     The Debtor is a successful lawyer in the prime of his legal career.  He reported income of $396,446 in 2014, and $2,407,546 in 2015.  The 2015 income included $1.9 million representing the Debtor's share of a $5,492,500 contingent fee award paid to his law firm, Strauch, Green and Mistretta, P.C. (the "Law Firm").  The Debtor's wife, Dawn Mistretta, is also an attorney in the Law Firm.

3.     The sole motivation for the Debtor's chapter 13 filing was to stay enforcement of and discharge his obligations to the Movant as set forth in an Equitable Distribution Judgment and Order entered on February 22, 2016, in Forsyth County District Court Case No. 13 CVD 4122 (the "ED Order"), a true and correct copy of which is attached hereto as **Exhibit A**.  Under

the ED Order, the Debtor was required to pay a total of $318,287.50 to Movant on March 23, 2016, as her share of a $1.909 million legal fee that was paid to the Debtor in March 2015 for his work on a legal matter that began before the parties separated in June 2013.  The Debtor was also ordered to pay $154,076.57 to Movant on April 15, 2016, as a distributive award.  The Debtor made a payment of $116,000 under the ED Order on March 22, 2016, leaving $356,364.07 due to Movant when the Debtor filed chapter 13.[1]  The Debtor's chapter 13 plan proposes to pay a dividend of approximately 10% to Movant.[2]

3.      On March 2, 2016, the Forsyth County District Court entered an Alimony Judgment and Order (the "Alimony Order"), a true and correct copy of which is attached hereto as **Exhibit B**.  The Debtor paid all amounts due on alimony prior to filing chapter 13, and he has remained current on his required payments of $6,000 per month in alimony.  Much of this sum is used to continue payments on a mortgage loan to Wells Fargo Bank, N.A. and to maintain the home which was deeded to Movant under the ED Order prior to the Petition Date.

4.      On March 23, 2016, the Debtor filed a pro se notice of appeal from the ED Order and the Alimony Order.

5.      Movant filed a Motion to Dismiss Appeal in Forsyth County District Court based upon the Debtor's failure to serve the proposed record on appeal on a timely basis.

6.      On August 5, 2016, after the deadline to serve the proposed record on appeal, the Debtor filed a Motion for Extension of Time to Serve Proposed Record on Appeal ("Extension Motion").  The Motion to Dismiss was denied, and the Extension Motion was allowed.  Thus, the

---

[1] Cleland also received a portion of the Debtor's retirement accounts at Womble Carlyle Sandridge & Rice, LLP and Strauch Green & Mistretta, P.C., and the Debtor paid $40,000 to Bell Davis & Pitt to pay part of the attorney's fees relating to alimony incurred by Movant in the state court divorce proceeding.
[2] Movant has many objections to the chapter 13 plan but is not formally addressing those objections unless and until her Motion to Dismiss is denied.

appeal is moving forward and is in the briefing stage.  This Court allowed the Debtor to hire appellate counsel, whose fees are subject to future review.

### Chapter 13 Schedules and Statement of Financial Affairs

**A.  *Original Schedules***

The Debtor filed his Statement of Financial Affairs and Schedules on April 26, 2016 (the "Original Schedules").  The Debtor listed three general unsecured creditors in "Schedule E/F: Creditors Who Have Unsecured Claims:"

- American Express - $11,018.36;

- Barclay Card - $22,739.23[3]; and

- Movant, shown as holding an "unliquidated" claim of $356,076.57[4] for a total of $389,834.16.

The Debtor also listed several secured creditors in "Schedule D: Creditors Who Have Claims Secured by Property," that he identified as "under-secured" by certain vehicles and a boat in the following amounts:

- Bank of America - $5,508.89;

- PNC Bank - $1,666.01; and

- US Bank - $383.12.

As admitted by the Debtor under penalty of perjury in the Original Schedules, the total amount of unsecured debt owed by the Debtor was $397,392.18.

Movant's claim was mischaracterized by the Debtor and is, in fact, liquidated.  Thus, the amount of debt in the Original Schedules exceeded the $394,725 debt limit for a debtor eligible for chapter 13. *See* 11 U.S.C. § 109(e).

---

[3] American Express filed a timely claim for $11,018, but Barclay Card did not file a claim before the bar date.
[4] Movant is owed $356,364.07 as reflected in a proof of claim she filed with the Court and agreed by the Debtor in DE 42, Response to Motion to Dismiss.

On September 9, 2016, the Debtor's 341 Meeting was concluded, having been continued from the first setting on May 23, 2016.  The Debtor announced on May 23, 2016, that he did not know of any changes to the Original Schedules.  The 341 Meeting on September 9, 2016 (the "Continued Meeting"), lasted approximately six (6) hours during which time counsel for the Movant examined the Debtor in detail regarding the Schedules.  At the beginning of the meeting, the Debtor and his counsel again confirmed the accuracy of the Original Schedules.

At the Continued Meeting, the correct amounts due to Movant and paid to Movant under the ED Order were confirmed by the Debtor, and the Debtor did not dispute that Movant is actually owed $356,364.07.  The Debtor also confirmed how he arrived at the value of the vehicles securing Bank of America, PNC Bank, and US Bank, verified the values, and confirmed the amount by which the lenders were under-secured on the Petition Date.

The Movant filed her original Motion to Dismiss under section 109(e) on September 15, 2016, on the basis that Movant's debt was, in fact, liquidated as a result of the ED Order, and that the unsecured claims scheduled by the Debtor exceeded the debt limit for chapter 13.

> **B.**    **_Amended Schedules_**
>
> > *1.*    *Vehicle Values*

The Debtor amended Schedule D on September 20, 2016, *see* **Exhibit C** hereto, to revise upward his values for the vehicles, reduce the unsecured deficiency claims, and bring his alleged unsecured debt to $391,692.25, just $3,032.75 under the debt limit of $394,725.  His new values reflected an unsecured claim of $1,858.09 rather than $5,508.89 for Bank of America.  Interestingly, PNC Bank filed a proof of claim wherein it claimed that the vehicle securing its $55,026.95 claim was valued at $53,400, and thus it is under-secured by its own estimate in the amount of $1,626.95.  The Debtor amended the PNC Bank unsecured claim to be $0 from his

original $1,666.01.  U.S. Bank was amended to $0 from an original $383.12.  With a correct amount for Movant of $356,364.07 plus the PNC claimed deficiency, the unsecured debt is $393,606.70 - $1,118.30 under the debt limit.

2.    *Wells Fargo Bank*

In the Original Schedules, Schedule D, the Debtor listed an obligation to Wells Fargo Bank, N. A. ("Wells Fargo") in the amount of $355,000, secured by real property co-owned by the Debtor and Movant at 2733 Spring Garden Rd., Winston-Salem, NC ("Spring Garden Property").  However, the Debtor did not own an interest in the Spring Garden Property on the Petition Date.  In accordance with the ED Order, the Debtor had transferred the Spring Garden Property to his ex-wife by deed dated March 16, 2016, attached to this Motion as **Exhibit D**. However, in the ED Order, the Movant was not ordered to remove the Debtor from the loan. The Debtor clearly knew, as he verified at the Continued Meeting, that he had transferred the Spring Garden Property to the Movant.  He knew that the obligation he has to Wells Fargo was not secured by any assets in his estate.  By failing to schedule Wells Fargo correctly, the Debtor unfairly manipulated the amount of his unsecured debt to obscure in the Original Schedules the true amount owed to unsecured creditors.

On October 5, 2016, the Debtor filed Amended Schedules and Statement of Financial Affairs (the "Amended Schedules") and listed Wells Fargo as an unsecured creditor in amount "unknown" and "contingent/unliquidated."  The Debtor stated that the liability to Wells Fargo was a "potential liability on a loan secured by property owned by a former spouse."  Wells Fargo Bank filed a proof of claim in the amount of $344,587 on August 9, 2016, which is attached as **Exhibit E** and which reflects that the Debtor and Movant were co-borrowers on a note dated November 19, 2012, in the amount of $372,500.  The loan matures on December 1, 2042, and is

secured by the Spring Garden Property.   As of the Petition Date, clearly, Wells Fargo was unaware that the Debtor was no longer an owner of the Spring Garden Property; Wells Fargo, in fact, is an <u>unsecured creditor</u> of the Debtor; and the amount due Wells Fargo was not unliquidated or contingent.   Addition of the Wells Fargo unsecured claim to the unsecured debt listed by the Debtor in the Amended Schedules brings the total unsecured debt to $738,193.70.

### C.    *Additional Debts*

#### 1.    *First Bank*

At the 341 Meeting, the Debtor testified that he had executed various obligations on behalf of the Law Firm.   Despite being required to list these debts in the Original Schedules, the Debtor apparently did not want creditors of his business to know of his bankruptcy filing.   After being notified of the filing, First Bank filed a proof of claim reflecting that the Debtor signed a continuing guaranty of a loan owed by the Law Firm.   As of the Petition Date, the balance due on the loan was $300,408.33.   Even though payments were current to First Bank as of the Petition Date, the deterioration in the Debtor's financial condition before the chapter 13 filing constitutes an event of default under the loan executed by the Law Firm.   *See* Promissory Note and Guaranty attached hereto as **Exhibit F.**   Despite First Bank's lack of knowledge of the grounds for default, default existed before the Petition Date.   The terms of the continuing guaranty of the Debtor provide that he is liable for the amount due First Bank, and this amount should have been listed as unsecured debt owed on the Petition Date.

#### 2.    *James Stemper*

The Debtor did not indicate in his Original Schedules that James Stemper was a creditor under an "oral agreement" that the Debtor reached with Mr. Stemper in 2015.   On August 19, 2016, Mr. Stemper filed a proof of claim in amount "unknown."   When questioned about the

claim at the Continued Meeting, the Debtor testified that Mr. Stemper had paid approximately $42,000 to renovate a condominium in Wilmington, North Carolina (the "Condo"), for shared use by Mr. Stemper and the Debtor, with each being entitled to stay in the Condo for 26 weeks of the year. In consideration of the renovations and forgoing rent of $800 per month for the Condo, the Debtor promised Mr. Stemper one-half use of the Debtor's 2015 Scout Dorado boat which is stored at a boat slip in Wilmington.[5] The Debtor purchased the boat in late 2015 for $60,000. He paid $10,000 down, and financed $50,000, resulting in monthly payments of $327.00 to pay off a total amount of $78,000.[6]

As of the Petition Date, Mr. Stemper's renovation expenditures had apparently been made, but he had not made significant use of the Scout boat. The Debtor testified at the Continued Meeting that he believed he owed Mr. Stemper a monetary obligation to maintain the boat for Mr. Stemper's use. Movant contends that the amount owed by the Debtor to Mr. Stemper is quantifiable such that it should be considered part of the Debtor's liquidated unsecured debt.[7] A reasonable, conservative approach would be to attribute at least half of the estimated future payments on the boat as Debtor's obligation to Mr. Stemper. Ten years of monthly payments of $163.50 (half of the monthly payment) would be $19,620. The Debtor is also obligated to insure and maintain the boat.

### D.    *Summary of Unsecured Debt*

As of the Petition Date, the Debtor's non-contingent, liquidated unsecured debt was:

- $356,364.07 (Movant);

---

[5] The boat slip is owned by Arriba Properties, LLC – members are the Debtor and James Stemper.
[6] US Bank filed a proof of claim that sets forth the payment terms.
[7] Movant's counsel conducted a 2004 exam of Mr. Stemper on November 21, 2016. At that time, Debtor's counsel, as well as the Debtor and his wife, interrupted Movant's counsel and objected to Movant's counsel's questions to Stemper in which she attempted to obtain an estimate by Mr. Stemper of the amount he felt he was owed by the Debtor. Similarly, at the 341 Meeting in September, Debtor's counsel also interrupted questioning of the Debtor when Movant's counsel tried to get an estimate by the Debtor of what he owed Mr. Stemper.

- American Express and Barclay Card - $33,757.59;

- PNC Bank - $1,626.95 (per its proof of claim); and

- Bank of America - $1,858.09

for a total of $393,606.70.  The addition of the Debtor's obligation to Wells Fargo totaling $344,587.00 significantly propels the Debtor over the chapter 13 debt limit of $394,725 such that the Debtor is not qualified to be a chapter 13 debtor under §109(e).  The Debtor's liabilities to First Bank and Mr. Stemper are also worthy of consideration in calculating the total non-contingent, liquidated unsecured debt.

### Pre-Petition Payments Made In Preparation for Filing

An Equitable Distribution Pre-Trial Order was entered on January 19, 2016, in Forsyth County District Court (the "PT Order").  The PT Order contained a statement of the Debtor's assets at that time; the Debtor had $1,275,268.80 in a Northwestern Mutual Brokerage Account, as well as $59,453 in an interest checking account with Dawn Mistretta Green, his wife, and $25,000 in a money market account.  After the ED Order was entered on February 22, 2016, when the Debtor understood his obligations under the ED Order, he paid $744,465 to the IRS and $104,797 to the North Carolina Department of Revenue in March 2016 for 2015 income tax. The total amount the Debtor paid in 2015 taxes was $849,262, an amount significantly lower than the $916,000 the parties stipulated at trial that the Debtor would be obligated to pay and that the District Court expressly included in its calculations when considering the Debtor's ability to satisfy the Judgment to the Movant.

Immediately upon entry of the ED Order, the Debtor closed his existing investment and bank accounts and opened others, as did his wife, in her own name, using funds taken from their closed individual and joint accounts.  The Debtor also consulted with Bankruptcy counsel on or

about February 26, 2016.  Before the Debtor filed chapter 13, he paid $124,361 to Wake Family

Law Group, approximately $20,000 to a business valuation expert for costs related to the

equitable distribution trial, and $27,000 to an accounting firm for assistance in the trial.

Several other payments were made within the ninety (90) days prior to the chapter 13

filing that were not for current expenses,[8] including:

- On or about March 23, 2016, $20,804.81 was paid to Vermont Student Assistance Corporation ("VSAC").  The VSAC payment was a payoff on a consolidated student loan that was incurred in 2003, required monthly payments, and was not due until approximately 2028.  The Debtor testified at the Continued Meeting that one reason he paid VSAC was that the loan was a non-dischargeable obligation.  Movant and the chapter 13 trustee believe the VSAC payment is an avoidable transfer under §547 of the Bankruptcy Code.  In fact, the trustee filed an adversary proceeding against VSAC on or about December 20, 2016.  VSAC should be added to the unsecured debt owed by the Debtor, putting the Debtor further over the debt limit.

- In the Original Schedules, the Debtor stated that he had made payments on his American Express account within the 90 days prior to filing as follows: three regular monthly payments of $784.00 each and one payment of $959.00.  A review of the American Express statements obtained through discovery reflects that the Debtor, in fact, made minimum payments of $265.00 on February 8, 2016, $254.00 on March 8, 2016,  and $260.00 on April 8, 2016 and made an "on line payment" on April 19, 2016, in the amount of $959.00.  The $959.00 payment was not an "ordinary course" payment and furthered the Debtor's efforts to stay under the debt limit.

- In the Original Schedules, the Debtor stated that he had made payments upon his Barclays account within the 90 days prior to filing as follows: three regular monthly payments of $508.53 each and one payment of $959.00.  The $959.00 payment was not an "ordinary course" payment and furthered the Debtor's efforts to stay under the debt limit.

The payments by the Debtor on the eve of filing to reduce his unsecured debt and leave the

Movant's claim as the primary unsecured claim were improper and in bad faith, and the Court

should find that the VSAC payment, at a minimum, should be considered in determining whether

the Debtor has exceeded the chapter 13 debt limit.

---

[8] As earlier mentioned, the Debtor paid a significant sum of over $150,000 on trial expenses and fees. These payments appear to have been made on fairly current invoices, but close examination has not yet been made.

### Dissipation of Assets Prior to and after the ED Trial

When the Movant filed a complaint for equitable distribution on June 14, 2013, she also sought a Temporary Restraining Order, which was granted on June 14, 2013.  An Order for Preliminary Injunction was issued on June 24, 2013 (the "PI Order"), and the PI order, attached as **Exhibit G**, restrained the Movant and Debtor from disposing of or altering any of the *marital, divisible or separate assets* of the parties, including but not limited to bank and brokerage accounts, stock, and other assets, except as necessary to pay the *reasonable and ordinary living expenses of the parties*, to pay attorneys' fees, and for the Debtor to operate the Law Firm in the ordinary course of business.  In contravention of the PI Order, the Debtor:

- Withdrew $44,000 from his SECU bank account and $45,000 from his retirement accounts on September 22, 2014, and proceeded to give at least $40,000 of that to his fiancée, Dawn Mistretta, for the October 2014 purchase of their new home in Wake Forest, North Carolina.  A total down payment of $84,756.79 was made.

- Invested income of $1,509,000 received from the large contingent fee award in March, 2015.  Related to this investment, the Debtor paid $7,540 in investment fees and lost $100,896.35 due to market downturn.

- Paid $84,000 in March 2015 to a brother-in-law for funds given to the Debtor and Movant to assist them in their purchase of the Spring Garden Property in July 2006.  The Debtor testified at the Continued Meeting that there was no note and no interest was charged by the brother-in-law.  When the Debtor had, in the past, offered some payment, the brother-in-law told the Debtor to "put the money in the kids' college fund."  Nevertheless, after he received the contingent fee, the Debtor paid $84,000 to the brother-in-law and further depleted the marital, divisible or separate assets.

- Paid approximately $18,000 for engagement and wedding rings for his fiancee in the Fall of 2014**.**

- Paid $5,000 to join the Heritage Club, a golf club, in Wake Forest, North Carolina, on May 1, 2015.

- Paid $23,232 in April 2015 to pay off a loan his second wife, Dawn Mistretta, owed the Local Government Federal Credit Union ("LGFCU").

- Paid $26,116 in June 2015 to pay off a credit card balance due Bank of America.

- Entered into a contract in October 2015 whereby he paid $34,500 for a boat slip in Wilmington, North Carolina, which was put in the name of Arriba Properties, LLC, a limited liability company formed with James Stemper.  (Mr. Stemper also paid $34,500 for a total of $69,000.)[9]

- Purchased a new 2015 Scout Dorado boat in November 2015, paying $10,000 down and financing $50,000.

- Purchased a new 2015 Chevrolet Suburban on November 28, 2014, for $76,623.00 and financed $70,477 with PNC Bank over 72 months at $1,064 per month.

- Acquired a 2013 Toyota Camry with his second wife in November 2015 for use by the family nanny.  A total of $19,258 was owed on the Petition Date.

- Paid $30,000 for an annuity on April 27, 2015.

- Paid $31,000 in an annual premium payment for a $1.0 million life insurance policy naming Dawn Mistretta as beneficiary on April 6, 2015.  The premiums have not been maintained, and Movant believes the policy has been forfeited.

- Paid $11,904.36 on February 1, 2016, from the joint account of the Debtor and his second wife to American Express (account ending in 5-9100) for payment upon a credit card in the name of the Debtor's wife.  The balance due had accumulated over twelve (12) months and was primarily comprised of costs related to the Debtor's wedding; lavish dinners; a honeymoon to California in early 2015; an expensive trip to the Umstead Hotel in Cary, North Carolina, including dinner at Heron's; a trip to the Ritz Carlton in New York; and approximately $17,000 in furnishings for the couple's new home in Wake Forest.  As of the Petition Date, $8,731 was owed on the American Express account, and this was comprised of approximately $5,700 to Delta Heating & Cooling, presumably related to the Wake Forest house.

- Spent approximately $320,000 on expenses of $2,500 or less from February 3, 2015, through the Petition Date.  These expenses are being summarized and will be presented to the Court at the hearing on this Motion.

The Debtor's failure to adhere to the PI Order and decision to engage in lavish[10] spending in the year prior to the chapter 13 filing contributed significantly to his alleged inability to fund the amounts due Movant under the ED Order.

---

[9] The ownership and existence of the boat slip and the LLC were not disclosed in the PT Order, as required by court order.

[10] In the ED Order, the Court noted that the debts incurred and expenditures by the Debtor post-separation were of a more extravagant nature than the Movant's expenses.

## Serious Omissions from the Original Schedules

The Original Schedules were filed under penalty of perjury. At the Continued Meeting, counsel for the Debtor reiterated that the Debtor had testified at the first setting of the 341 meeting that the Debtor was unaware of any changes that needed to be made. Nevertheless, during the Continued Meeting, questioning from Movant's counsel revealed that the Original Schedules were replete with blatant errors (some significant, some careless), omissions, and inaccuracies. Notably, the Movant determined the following errors in the Schedules that supplement those previously mentioned:

- The Debtor failed to list his 1/3 remainder interest in his deceased paternal grandmother's trust. The Debtor's father holds a life estate. The trust owns eight or nine rental properties in Winston-Salem, North Carolina, that are insured for approximately $1.0 million as well as firearms and other memorabilia that were appraised, according to the Debtor, for approximately $25,000, and other heirlooms.

- The Debtor failed to disclose gifts of over $600 made within two years prior to filing. In fact, wedding jewelry of $18,000 was given to his new wife.

- The Debtor failed to list his debt to James Stemper or any executory contract with James Stemper.

- The Debtor failed to schedule his guaranty to First Bank and several co-debtors, including the Law Firm and the other owner of the Law Firm. This is indicative of the Debtor's desire to impact Movant's claim -- but not his business credit -- by filing chapter 13. At the 341 meeting, the Debtor testified that he thought he guaranteed several real estate and equipment leases related to the Law Firm.

- The Debtor failed to schedule clearly the balances due upon loans taken from his retirement plans.

- The Debtor had paid Mr. Stemper for rights to use hunting property in Virginia, and he had contributed to purchase of a building and upkeep of that property.

- The Debtor incorrectly scheduled the Wells Fargo loan as a secured debt.
  .

**LEGAL SUPPORT FOR RELIEF REQUESTED**

Debtor's chapter 13 case should be dismissed because the Debtor filed the case in bad faith <u>and</u> because the Debtor's unsecured claims exceed the debt limits such that the Debtor is not qualified to be a chapter 13 debtor.

Under 11 U.S.C. § 1307(c), upon request by a party in interest, a chapter 13 case can be dismissed or converted to chapter 7, "for cause."  This statute includes a non-exclusive list of causes that would justify dismissal or conversion, but courts have also held that acts of bad faith committed prior to filing constitute "cause" for the purposes of § 1307(c).  *See, e.g., Marrama v. Citizen Bank*, 549 U.S. 365, 367 n. 3 (stating that because a chapter 13 case could be dismissed or converted to chapter 7 based on bad faith, the effect was "tantamount to a ruling that the individual does not qualify as a debtor under chapter 13.")  *Id.* at 374.   The actions of the Debtor prior to filing, in the view of the Movant, support a finding of bad faith on the *Debtor's part in his filing of the chapter 13 case to discharge the obligations imposed on the Debtor under the ED Order.*

And, 11 U.S.C. § 109(e) sets forth who is eligible to be a chapter 13 debtor:

Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $250,000 and noncontingent, liquidated, secured debts of less than $750,000, or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $250,000 and noncontingent, liquidated, secured debts of less than $750,000 may be a debtor under chapter 13 of this title.

Under 11 U.S.C. § 104(b), the Section 109(e) debt limits are adjusted every three years to reflect changes in the cost of living.  As of April 1, 2016, the debt limit for unsecured claims is $394,725.

Based upon the Schedules filed by the Debtor, which are replete with erroneous information clearly manipulated in an obvious effort to contort the facts into the appearance of a

proper chapter 13 case, including, most significantly, the nature of the Movant's claim as an unliquidated claim, the amendment of debt owed to under-secured creditors, and the incorrect scheduling of Wells Fargo, among other acts of the Debtor, the Debtor's case should be dismissed.

The Movant will separately file a Memorandum of Law in support of this Motion.

WHEREFORE, Movant Jennifer Joyner Cleland respectfully requests that the Court dismiss the Debtor's case for violation of the debt limits under 11 U.S.C. § 109(e) and for cause under 11 U.S.C. 1307(c) and for such other relief as the Court deems appropriate.

Dated: January 25, 2017

**NELSON MULLINS RILEY & SCARBROUGH LLP**

/s/ Terri L. Gardner
Terri L. Gardner, State Bar No. 9809
Leslie Lane Mize, State Bar No. 32790
4140 Parklake Avenue, Suite 200
Raleigh, North Carolina 27612
Telephone: (919) 329-3800
Telecopy: (919) 329-3799
Email: terri.gardner@nelsonmullins.com
Email: leslie.mize@nelsonmullins.com

*Counsel for Jennifer Joyner Cleland*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

IN RE:

STANLEY BOYD GREEN,               CASE NO.  16-02105-5-SWH
                                             CHAPTER 13

      DEBTOR.

## NOTICE OF AMENDED MOTION TO DISMISS CASE FOR NON-COMPLIANCE WITH SECTION 109(e) AND BAD FAITH

NOTICE is hereby given of the Motion to Dismiss Case for Non-Compliance with Section 109(e) and Bad Faith, filed by Jennifer Joyner Cleland in the above-referenced case, by and through undersigned counsel. This notice is hereby given and served as of the date indicated below.

Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)

If you do not want the court to grant the Motion, or if you want the court to consider your views on the matter, then on or before **February 21, 2017 (21 days)**, unless otherwise ordered, you or your attorney must file with the court, pursuant to Local Rule 9013-1 and 9014-1, a written response, an answer explaining your position, at:

U.S. Bankruptcy Court, PO Box 791, Raleigh, NC 27602.

If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above. You must also mail a copy to the parties listed in the certificate of service served herewith, including:

Marjorie K. Lynch, Esquire           Terri L. Gardner
Bankruptcy Administrator             Nelson Mullins Riley & Scarborough LLP
434 Fayetteville Street, Suite 640     4140 Parklake Avenue, Suite 200
Raleigh, NC 27601                  Raleigh, NC 27612

If a response is filed in writing on or before the date set above, a hearing will be conducted on **February 21, 2017** at **10:30 a.m.** in Room 208, 300 Fayetteville Street, Raleigh, North Carolina.

If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion and may enter an order granting that relief.

Dated: January 25, 2017

**NELSON MULLINS RILEY & SCARBROUGH LLP**

/s/ Terri L. Gardner
Terri L. Gardner, State Bar No. 9809
Leslie Lane Mize, State Bar No. 32790
4140 Parklake Avenue, Suite 200
Raleigh, North Carolina 27612
Telephone: (919) 329-3800
Telecopy: (919) 329-3799
Email: terri.gardner@nelsonmullins.com
Email: leslie.mize@nelsonmullins.com

*Counsel for Jennifer Joyner Cleland*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

**IN RE:**

**STANLEY BOYD GREEN,**                    **CASE NO.  16-02105-5-SWH**
                                           **CHAPTER 13**

        **DEBTOR.**

### CERTIFICATE OF SERVICE

        **I HEREBY CERTIFY** that the foregoing **AMENDED MOTION TO DISMISS CASE**

**FOR NON-COMPLIANCE WITH SECTION 109(e) AND BAD FAITH AND NOTICE**

**THEREOF** has been filed electronically in accordance with the Local Rules and was therefore

served electronically on those entities that have properly registered for such electronic service

and/or by depositing a copy thereof in the United States mail, postage prepaid, addressed to the

parties below:

John F. Logan                              William E. Brewer, Jr.
Office of the Chapter 13 Trustee           The Brewer Law Firm
PO Box 61039                               311 E. Edenton Street
Raleigh, NC 27661-1039                     Raleigh, NC 27601

Stanley Boyd Green
913 Thompson Glenn Place
Wake Forest, NC 27587

        Dated: January 25, 2017

                                           /s/ Terri L. Gardner
                                           Terri L. Gardner

**EXHIBIT A**

NORTH CAROLINA      FILED     IN THE GENERAL COURT OF JUSTICE

FORSYTH COUNTY      DISTRICT COURT DIVISION

     2016 FEB 22 P 2: 47     13 CVD 4122

JENNIFER CLELAND GREEN,

    FORSYTH COUNTY, C.S.C.

     Plaintiff,

     BY_____

V.            EQUITABLE

     DISTRIBUTION JUDGMENT AND ORDER

STANLEY BOYD GREEN,

     Defendant.

---

THIS CAUSE came on for hearing before the undersigned Retired Recalled District Court Judge presiding at the JANUARY 19 – 29, 2016 civil, non-jury sessions of the District Court of Forsyth County upon the parties' claims for equitable distribution. Plaintiff was present in Court and represented by her attorney, Robin J. Stinson. Defendant was present in Court and represented by his attorney, Michael F. Schilawski. Based upon the testimony of the parties and the experts, documentary evidence, demeanor of the witnesses, the pleadings, and the stipulations as set forth in the Final Pretrial Order and during trial, and other documents of record and by a preponderance of the evidence, the Court enters this judgment and order with the following:

## FINDINGS OF FACT

1. The Plaintiff is a citizen and resident of Forsyth County, North Carolina and the Defendant is a citizen and resident of Wake County, North Carolina.

2. The Defendant was duly served with a copy of the complaint and the notice of this hearing as required by law.

3. The Court has jurisdiction over the parties and the subject matter and this case is properly before the Court.

4. Plaintiff and Defendant were married on October 22, 1994, and separated on June 25, 2013. The parties were divorced September 8, 2014.

5. Four children were born of the marriage of the parties; to wit: Stanley Cleland Green, born August 28, 1995; Jack Lassiter Green born October 12, 1997; David Sarber Green, born February 20, 2000; and Alexander McDevitt Green, born October 3, 2002.

6. The parties hereto covenant that each has made a complete disclosure to the other of all real, personal, tangible, and intangible property that he or she owns solely, jointly, severally, or in which he or she may have a beneficial interest. Any subsequently discovered non-disclosed marital asset will be divided between the parties, with the non-disclosing party receiving 40 percent and the other party receiving 60 percent of the actual non-disclosed marital asset or 60 percent of its value.

ATTEST A TRUE COPY. Witness my hand and Official Seal This 22 day of February, 2016

Deputy/Assistant Clerk Superior Court Forsyth County, N.C.

1

7.    A Final Pretrial Order was signed by the Honorable Lillian Jordan prior to the beginning of trial on January 19, 2016.

8.    During the marriage and before the date of separation the parties acquired the tangible and intangible personal property listed on Exhibit A which is marital property and is attached hereto and incorporated herein by reference. The parties stipulated to the values and the distribution of the property listed on Exhibit A of the January 19, 2016 Equitable Distribution Pretrial Order. The total value of the property on Exhibit A to be distributed to the Plaintiff is $251,049.11. The total value of the property on Exhibit A to be distributed to the Defendant is $220,666.09.

9.    During the marriage the Defendant contributed to SF&G Employees Retirement Plan that is listed on Exhibit A (d) at number 11 of the Equitable Distribution Pretrial Order entered herein, and by stipulation of the parties it shall be divided equally between the parties. The marital portion of this plan has divisible property (passive increases/decreases) that has accrued since the date of separation. The divisible property shall also be divided equally between the parties with the amount to be determined by the Plan Administrator. Plaintiff's attorney shall draft a separate QDRO to this end.

10.    During the marriage the Defendant contributed to a Womble Carlyle Savings & Self-Employed Retirement Plan. After he left the employment of Womble Carlyle, the Defendant rolled this account over into an IRA. The value of this account on the date of separation as stipulated to by the parties is $226,543.00 that is listed on Exhibit A attached hereto. No funds have been deposited into this account since the date of separation, however the Defendant has withdrawn funds from the IRA. The Court is not making a finding as to whether this withdrawal from the IRA was in violation of an Injunction in this case.

11.    The parties stipulated that each shall receive one-half of this IRA balance on the date of separation plus or minus passive gains or losses on that one-half since the date of separation to be determined by an IRA Fiduciary, if necessary. The Plaintiff's attorney shall draft any documents necessary in addition to this Judgment and Order.

12.    The Plaintiff, by stipulation, shall receive the passive gain on her T. Rowe Price IRA since the date of separation and that amount is $14,928.59.

13.    During the marriage and at the time of the parties' separation, the parties owned one parcel of real property that the parties stipulated is marital property. The property is deeded in the names of the Plaintiff and the Defendant.

14.    This property is located at 2733 Spring Garden Road, Winston-Salem, NC, and was the marital residence. The parties disagreed upon the value and the distribution of said property.

15.    Three real estate appraisers testified as to the value of this marital residence. One of the biggest differences in adjusting the comparable sales for the additions and/or deficiencies between the marital residence and them is the cost per square foot when the comparable sale was larger or smaller than the marital residence. The Plaintiff's appraiser, Mr. Clapp, used $15.00 per square foot. The Defendant's appraiser, Mr. Stainback, used $30.00 per square foot. The third appraiser, Mr. Slaughter, was hired just after the separation of the parties to perform a date of separation appraisal. He used $50.00 per square foot. The residence is 60 years old. All the

comparable sales were 48 to 65 years old. They averaged $120.00 per square foot according to the sales price.

16.    The Court finds that $50.00 per square foot used by Mr. Slaughter is a more reasonable figure to use to adjust for the difference in the size of the comparable sales compared to the marital residence. The Court further finds that substituting $50.00 per square foot for Mr. Clapp's $15.00 per square foot in each of the comparable sales along with the other figures he used to make adjustments and then averaging the comparable sales is the basis of the Court's finding as to the value of the marital residence on the date of separation and the present value. The Court finds that the value on the date of separation, June 25, 2013, was $410,316.00 and the present value is $414,983.00.

17.    The marital residence shall be distributed to the Plaintiff. Even though Defendant has remarried since the parties' divorce, pursuant to N.G. Gen. Stat. Section 50-20(c1), a second or subsequent spouse acquires no interest in the marital and divisible property of his or her spouse from a former marriage until a final determination is made in the marital property of the spouse's former marriage. By virtue of this final determination, Defendant is divested of his ownership in, and Plaintiff is vested as the sole owner of, the marital residence.

18.    The Divisible Property value of the marital home is based upon passive appreciation caused by the real estate market being stable or even improving since the date of separation and is a positive $4,667.00 and it shall be distributed to the Plaintiff.

19.    As of the date of separation, the balance on the mortgage on the marital residence located at 2733 Spring Garden Road, Winston Salem was $368,448.74. Therefore the Plaintiff is distributed a net value of $41,867.26 as of the date of the separation. The Plaintiff has made all the mortgage payments since the date of separation. The reduction in the mortgage in the sum of $18,364.94 is active appreciation and is not divisible property and is the separate property of the Plaintiff.

20.    Defendant is a licensed attorney in Winston Salem and Raleigh, NC. He attended law school after the parties hereto were married. He clerked for Judge Joe John on the NC Court of Appeals for one year before being hired by Womble Carlyle. In 2009 he joined the law firm of Strauch Fitzgerald & Green P.C. (hereinafter The Firm) as a founding partner. The other two members of the firm had practiced with the Defendant at Womble Carlyle. The Firm is a corporation that distributes all profits as income to the owners in order to avoid paying corporate taxes.

21.    The Plaintiff offered Roger V. Edwards, CPA, ABV, CFF as an expert in business valuations and the Defendant offered Betsy Fonvielle, CPA, CFF, CBA as an expert in business valuations. The Court accepted both as expert business valuators.

22.    The reports and opinions of Ms. Fonvielle and Mr. Edwards are very difficult to compare. Not only did they use different methods, but some of the actual numbers and information used were different. Even though they had the same information from The Firm, for example, they each used different figures for the actual salary of the Defendant when adjusting the salary. They also used different national medians to adjust the actual salaries although they were using some of the same national sources. Bottom line, Mr. Edwards, Plaintiff's expert, found the Defendant's interest in The Firm to be $428,400.00 on the date of separation and $415,700.00 on the date of trial. Ms. Fonvielle, Defendant's expert, valued the Defendant's interest at the same times to be

3

$301,000.00 on the date of separation before an adjustment to $305,500.00 for an error she made. Her current value is $409,000.00. Ms. Fonvielle used only the Capitalized Returns value of $305,500.00 for the date of separation value even though she calculated the Net Asset Value and the Direct Market Data Method. For the current value she calculated it using these same three methods, however, she averaged the Capitalized Returns and the Direct Market Data Method. If she had not, the current value would have been $458,000.00 using only the Capitalized Returns Method.

23.    The Court finds that Ms. Fonvielle's reports are marginally better than Mr. Edward's with the adjustments the Court will make. Ms. Fonvielle has considerably more experience in valuing businesses and professional practices.

24.    After considering the three methods used – Net Asset Value for a value of $172,042 (before discounts and exclusive of any amount for goodwill), Capitalized Returns for $301,000 or $305,500.00 and Direct Market Data for $291,700.00, Ms. Fonvielle's opinion favored the Capitalized Returns Method for the date of separation value. Her opinion of the Defendant's interest in The Firm on the date of separation is $301,000 in spite of her error.

25.    Ms. Fonvielle used essentially the same methods described above to find a present day value of The Firm. She also used data from The Firm and data from nationally recognized sources. For the Net Asset Value she found a value of $150,074.00 before discounts and exclusive of any amount for goodwill. For the Capitalized Returns value she found $458,000.00 to be the value without adding any revenue from the Cruise Case. For the Direct Market Data value she found it to be $360,000.00. It is her opinion that for the present value of Defendant's interest in The Firm the Capitalized Returns and the Direct Market Data should be averaged to produce the best value. This average is $409,000.00 and the Court finds this to be the date of trial value, noting that Ms. Fonvielle used 26.32% for Defendant's interest that was his date of separation interest that is now 40% to 50%. The Court finds that her use of the date of separation percent of ownership is appropriate since the Defendant did not receive 40% to 50% during the marriage and his responsibilities increased after the departure of one of the owners.

26.    The Court recalculated the date of separation value of The Firm using the Direct Market Data Method used by Ms. Fonvielle but using the same Price/Gross Multiple that she used when she valued the current value. She used .65 for the current value and .59 in the date of separation value. This changed her date of separation Direct Market Data value to $323,453.00 from $291,700.00. The Court then averaged the Direct Market Data value with the Capitalized Returns value of $305,500.00 as Ms. Fonvielle did for the current value to get a date of separation value of $314,476.00. The Court finds that the date of separation value of Defendant's interest in The Firm is $314,476.00.

27.    The difference between the date of separation value and the current value of the Defendant's interest in the firm is a positive $94,524.00. All of this increase is passive and is divisible property and shall be distributed to the Defendant. Any active increase in value of his interest in The Firm after the date of separation is the difference between the 26.32% and 40% to 50% of the current total value of The Firm. Ms. Fonvielle used the same per cent the Defendant was receiving before the date of separation to calculate her after the date of separation value and not the new 40% to 50% interest the Defendant began receiving shortly after the date of separation to the present. The Defendant did not rebut the passive nature of the $94,524.00 increase in value of The Firm after the date of separation that occurred by the work of third parties and his continuing

4

to work as he did during the marriage. The $94,524.00 is divisible property and it shall be distributed to the Defendant.

28.    Both experts who valued The Firm testified that the Goodwill of The Firm is an intangible asset and that the value of the Goodwill is a part of the value as calculated using the Capitalization Returns Method that Ms. Fonvielle used or the Excess Earnings Method Mr. Edwards used. The Court finds that the value of the Goodwill of The Firm is an amount within the values found by Ms. Fonvielle in placing a value on future earnings.

29.    The Defendant's law firm of Strauch Fitzgerald & Green, P.C., and now Strauch Green & Mistretta, P.C, brought with it in 2009 a case from Womble Carlyle entitled Cruise Connections Charter Management Inc. v. Royal Canadian Mounted Police, Et Al (hereinafter called the Cruise Case). This case took years to complete with appeals and finally a mediated settlement.

30.    The Firm won the case and The Firm received a fee of $5,492,500.00. The Defendant's share of this fee was $1,909,277.90. Prior to a division of the fee between the shareholders of The Firm, the firm was reimbursed advanced costs of $146,075.20, other employees were given bonuses totaling $475,157.93, and Womble Carlyle was paid $200,000.00. Mr. Fitzgerald, a former owner of The Firm, was paid 8% of the balance after the foregoing items were paid. The balance, except for around $150,000.00 which had been saved to pay Womble Carlyle, if needed, was divided between Mr. Strauch and the Defendant according to their bylaws.

31.    The law firm had 6,608 total hours in the Cruise Case. 5,159 of these hours were on the books before the date of separation of the parties, June 25, 2013. The Firm is primarily a civil litigation firm providing legal services mostly to businesses. The cases include toxic tort, contract law, product liability, personal injury, aviation, trucking and environmental cases. The Firm lawyers work by the hour and do not at this time have any contingency cases and have no plans to have any. The Cruise Case was an exceptional case. Because it was exceptional and the fee it generated was unusual compared to the other fees generated on the hourly rate cases, the appraisers of The Firm did not consider the fee as it did the other fees of the firm as set out below. Therefore, the Court finds that a portion of the Cruise Case fee received by the Defendant after the date of separation is divisible property separate from the value of The Firm and is considered by the Court as deferred compensation for work performed during the marriage. This fee was $1,909,277.00. The parties stipulated that the federal and state taxes to be paid on said fee may be at least $916,433.00. The net of the fee is $992,844.00.

32.    For her date of separation value, Ms. Fonvielle calculated the hourly rate for the prior closed contingency cases to be a rate of $146.50 per hour. She used this to value the work in progress on the date of separation for the Cruise Case. The figure she then used for WIP in her Net Asset Valuation (NAV) calculations was $891,257.00 and that included $755,867.00 for the Cruise Case. Her valuation based on Balance Sheets is $653,655.00 for The Firm and therefore $172,042.00 for the Defendant's interest before discounts.

33.    The Court finds that 78% of the work spent by The Firm on the Cruise Case was before the date of separation. The deferred compensation (after taxes) the Defendant received after the date of separation for the work done before the date of separation was $774,418.00.00. Ms. Fonvielle used a total of $523,723.00 of the expected Cruise Case fee on her normalized income statements to determine the date of separation value of The Firm using the capitalized returns methodology. 26.32% of this amount is $137,844.00 and it shall also be deducted from

the fee the Defendant received so as not to double dip and count this twice. Therefore, the divisible property portion of the Cruise Case fee is $636,575.00 and this fee shall be divided equally between the parties with the Plaintiff being distributed $318,287.50 and the Defendant being distributed $318,287.50.

34.    The parties stipulated in the Pretrial Order that the debts listed in this paragraph are marital debts and the Court so holds. The balance of the mortgage on the marital residence to Wells Fargo Mortgage had a balance of $368,448.74 on the date of separation. This debt is distributed to the Plaintiff. The Defendant has a student loan debt with a balance of $21,605.55 on the date of separation and it is distributed to the Defendant. The Plaintiff paid $450.00 toward this debt since the date of separation and she shall receive credit for this payment. The parties owed the Orthodontist $7,337.00 on the date of separation and it has been paid in full by the Plaintiff. She shall receive credit for this payment. The parties owed Chuck Jones $84,000.00 on the date of separation and the Defendant has paid this in full and he shall receive credit for said payment. The parties owed Kemper Auto Insurance $953.12 for insurance on the Defendant's two vehicles and the Plaintiff paid this bill. She shall receive credit for this payment.

35.    Both parties presented evidence on some of the factors in NCGS 50-(c) for an unequal division.

36.    The Plaintiff graduated from law school in 1992 and clerked for Judge Joe John on the NC Court of Appeals for 2 to 3 years. She had not practiced law since that clerkship, except for a few weeks. The parties had four sons beginning during the first year of their marriage while the Defendant attended law school in Vermont. The Plaintiff has not worked outside of the home since the few weeks mentioned above and in 2000 she and the Defendant agreed for her to allow her law license to become inactive. The Defendant is a practicing lawyer with yearly income of approximately $300,000.00 per year.

37.    The Plaintiff is 50 years old and the Defendant is 45 years old and both are in good health. They were married 18 years 8 months at the time of the separation.

38.    Both parties have incurred debts since the date of separation. Currently the Plaintiff owes her father over $82,000.00 for living expenses and over $184,668.77 for attorney fees. He borrowed these sums from his retirement account. The Defendant did not pay any spousal support the first year the parties were separated. He paid $2200.00 per month from July 2014 through June 2015, then $3,316.00 per month from July 2015 until September, 2015 and then per consent order he paid $5000.00 per month beginning in October 2015 until the present. She also owes $355,768.80 balance on her mortgage per this Judgment and Order and she has a car loan balance of $29,625.00.

39.    The Defendant's debts he has incurred since the date of separation are of a more extravagant nature than the Plaintiff's. In addition to attorney fees in the amount of $202,526.00, he has purchased a vehicle that has a balance of $58,900.00, bought a boat with a loan balance of $50,655.00 after paying $10,000.00 down, and has a car loan for the car he purchased for the nanny of the children of his now wife that has a balance of $19,738.80. In addition, the Defendant has credit card balances of $21,000.00 and a student loan balance of $21,136.46. One of the credit cards is in the name of his now wife and several thousand dollars on his credit card paid for his honeymoon at the Ritz in San Francisco. Although they are not debts, the defendant has recently paid $34,500.00 for ½ interest in a boat slip and has joined a country club. Both parties owe their lawyers for the six days of trial of this matter and the alimony portion of the trial.

6

40.    Since the date of separation the Defendant has continued to contribute several thousand dollars per month to his retirement plan which since the separation is his separate property and the Plaintiff has not had the funds to contribute to her IRA, however, her employer (her father) has contributed $1,062.06 to an employer provided retirement plan for her.

41.    In addition to the marital and divisible assets distributed in this Judgment and Order, the Plaintiff has AT&T/VGTMA stock worth $19,412.55, Comcast /VGTMSA stock worth $1,069.43, Sun Trust Stock worth $15,799.55, T. Rowe Price IRA worth $47,974.38, about $7000.00 in First Citizens accounts and $992.72 in the SECU for a total of approximately $92,000.00.

42.    In addition to the marital and divisible assets distributed in this Judgment and Order, the Defendant has separate assets including a house with his new wife in which he invested $40,000.00, Boat slip for which he paid $34,500.00 for a ½ interest, SECU checking and MM which he owns with his new wife in the amount of $85,038.97, a boat worth $60,000.00 with $10,000.00 equity, approximately 27 guns (rifles, handguns and shotguns) value not in evidence, 100 knives, stamps, 3 antique pocket watches, coins, and a separate retirement plan worth more than $107,000.00. These separate assets of the Defendant are valued at more than $276,500.00. In addition he has a whole life insurance policy with a face value of $1,275,000.00 with annual payments of $32,504.00. He also has an investment portfolio with Northwestern Mutual with a balance of $1,275,268.80 some of which is divisible property as described in paragraph 33 above.

43.    The Defendant helped to establish a very profitable law practice during the marriage after attending law school during the marriage. The Plaintiff was a full time homemaker during the marriage raising the parties' four sons. The Plaintiff took care of the home and the children to give the Defendant all the time he needed to build his law practice that included his traveling some. The Defendant in his testimony praised the Plaintiff as an outstanding mother.

44.    To recap the values of the marital property to be distributed to the parties to determine if a distributive award is necessary to achieve equity between the parties, the Court finds that the Plaintiff shall be distributed marital property and divisible property which totals a net of $622,059.34 after being credited with the marital debts distributed to her in this Judgment and Order. The property that has been distributed to her in this Judgment and Order includes $41,867.26 for the net equity in the marital residence as of the date of separation, $4,667.00 of divisible property in the marital residence, $14,928.59 which is the passive appreciation of her T. Rowe IRA, $318,287.50 which is one-half of the marital portion of the Cruise Case fee Defendant received, and $251,049.11 for the items from Exhibit A of the Equitable Distribution Pretrial Order, together with the debts assigned to her pursuant to Exhibit I of the Equitable Distribution Pretrial Order.

45.    The Defendant shall be distributed marital property and divisible property which totals a net of $842,348.04 after being credited with the marital debts distributed to him in this Judgment and Order. The property that has been distributed to him in this Judgment and Order includes $318,287.50 which is one-half of the marital portion of the Cruise Case fee he received, $314,476.00 for his interest in The Firm, $94,524.00 the divisible property of The Firm, and $220,666.00 for the items from Exhibit A.

46.    The presumption of a distribution in kind of the marital and divisible property as far as is practical was not rebutted, however due to the nature of some of the marital property it is impractical to order a complete in-kind distribution, and the distributive award granted herein to

7

the Plaintiff facilitates the distribution and is necessary to achieve equity between the parties. The Defendant has the means to pay the distributive award.

47.    In considering the evidence in the above paragraphs and the stipulation of the parties, the Court finds that an equal distribution of the marital and divisible property is not equitable in this case. The Plaintiff shall be distributed 53 % of the total net estate that totals $1,464,407.38 and the Defendant shall be distributed 47%. 53 % is $ 776,135.91. The distributive award the Defendant shall pay to the Plaintiff is $ 154,076.57.

Based upon the forgoing Findings of Fact, the Court makes the following:

## CONCLUSIONS OF LAW

1.    This Court has jurisdiction over the parties hereto and the subject matter of this cause.

2.    The marital and divisible property of the parties is as set forth in the Findings of Fact above. The values of the marital and divisible property of the parties, both assets and liabilities, are as set forth in the Findings of Fact above.

3.    The separate property of the parties is as set forth in Finding of Fact numbers as set forth above.

4.    The parties are entitled to an equitable distribution of marital property.

5.    An equal division of the net marital and divisible property is not equitable. The division of the marital and divisible property set forth in the decretal paragraphs below is an equitable distribution of the marital and divisible property. This division is fair to both parties based on all of the evidence presented and the stipulations of the parties both before and during trial.

6.    A distribution in-kind as far as is practical was not rebutted, however due to the nature of some of the marital property it is impractical to order a complete in-kind distribution, and the distributive award granted herein to the Plaintiff facilitates the distribution and is necessary to achieve equity between the parties. The Defendant has the means to pay the distributive award.

7.    Such of the Findings of Fact above as are more properly denominated Conclusions of Law are incorporated herein by reference as if set forth in full.

Based upon the foregoing Findings of Fact and Conclusions of Law,

## IT IS THEREFORE ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.    Each party shall have as his/her sole and separate property the household furnishings and other tangible personal property now in his/her possession except as listed on Exhibit A attached hereto which the party in possession shall give to the other party to whom the property has been distributed within 30 days from the filing of this Judgment and Order.

2.    Each party is hereby awarded sole ownership of the assets listed in his or her respective column on Exhibit A attached hereto. Plaintiff shall have ownership of all assets listed in her column and said items shall be her sole and separate property, free of all claims of Defendant. Defendant shall have ownership of all assets listed in his column and said items shall be his sole and separate property, free of all claims of Plaintiff.

3.      The marital residence located at 2733 Spring Garden Road in Winston Salem, NC shall be distributed to the Plaintiff. Defendant is hereby divested of his ownership interest in, and Plaintiff is hereby vested as the sole owner of, the house and lot located at 2733 Spring Garden Road, Winston-Salem, Forsyth County, North Carolina and more particularly described as follows:

BEING KNOWN AND DESIGNATED as Lot no. 11 of Spring Garden Development, as recorded I Plat Book 16, Page 132, Forsyth County Registry, North Carolina, reference to which is hereby made for a more particular description.

BEING INFORMALLY known as Tax Lot 011, Block 2495, Forsyth County Tax Records.

4.      Defendant shall execute a special warranty deed transferring all of his right, title and interest in the property located at 2733 Spring Garden Road, Winston Salem, NC to Plaintiff. Plaintiff's attorney shall prepare and deliver to Defendant's attorney said deed conveying Defendant's interest in said property to Plaintiff and Defendant shall execute said deed within fifteen (15) days of receiving the deed from Plaintiff's attorney. The divisible property value of $4,667.00 is also distributed to the Plaintiff. The Plaintiff shall assume and pay in full according to the terms of the present mortgage at Wells Fargo Mortgage that is a lien on said residence until such time as she sells the residence or refinances it.

5.      The passive increase in value of the Plaintiff's T. Rowe Price IRA is $14,928.59 and shall be distributed to the Plaintiff.

6.      $318,287.50 of the marital portion of the Cruise Case fee received by the Defendant that is in the possession of the Defendant shall be distributed to the Plaintiff. The Defendant shall pay this sum by certified check to the Plaintiff within 30 days from the filing of this Judgment and Order.

7.      The Defendant's interest in The Firm shall be distributed to him and this includes the value on the date of separation and the passive increase until date of trial.

8.      One-half of the Defendant's Womble Carlyle Savings & Self-Employed Retirement Plan balance on the date of separation shall be distributed to the Plaintiff including any passive gains or passive losses since the date of separation. The Plaintiff's attorney shall draft any necessary documents to effectuate this.

9.      The Plaintiff shall receive one-half of the Defendant's Employee's Retirement Plan with The Firm of the date of separation value plus passive gains or passive losses to the date of trial as determined by the Plan Administrator. The Plaintiff's attorney shall draft a QDRO to effectuate this transfer to the Plaintiff.

10.     The other $318,287.50 of the marital portion of the Cruise Case fee received by the Defendant shall be retained by the Defendant.

11.     The Plaintiff shall be distributed 53% of the total net marital and divisible property and this totals $776,665.93.

12.     The Defendant shall pay to the Plaintiff the sum of $154,076.57 on or before April 15, 2016 as a distributive award.

9

13.     At the request of the other party, each party shall execute and deliver any and all written instruments or documents reasonably necessary or desirable to effectuate the purposes and provisions of this Judgment and Order.

14.     Except as expressly provided otherwise in this Judgment, each party shall be solely responsible for all debts and liabilities incurred by that party following the date of separation including all charges on any account.

15.     The terms of this Judgment and Order are enforceable through the contempt powers of this Court.  Each party has the ability to seek enforcement of this Judgment at his or her respective election.

16.     This Judgment and Order resolves all claims related to the parties' respective claims for equitable distribution of marital and divisible property and debts.

This ___19th___ day of February, 2016.

_____
Judge Presiding (13 CVD 4122)

10

*Exhibit A*

## SCHEDULE A
## MARITAL PROPERTY AS TO WHICH THERE IS AGREEMENT
## AS TO VALUE & DISTRIBUTION

| | DESCRIPTION AND CURRENT POSSESSION OF ITEM | VALUE TO W | VALUE TO H |
|---|---|---|---|
| 1 | 2003 Honda Odyssey Van (Parties Donated Van after date of separation) | $1.00 | $1.00 |
| 2 | Joint SECU Shares x7908 (H) and (W) | $28,000.00 | $2,000.00 |
| 3 | Marital portion of Plaintiff's T. Rowe Price IRA (W) | $30,968.69 | |
| 4 | ACS/BNY Mellon (W) HSA account used to pay children's medical expenses post DOS | $920.37 | $920.37 |
| 5 | Tangible Household Furnishings, Jewelry and Personal Effects and Other Tangible Personal Property Received by Husband and Wife, already divided (H) and (W) | $1.00 | $1.00 |
| 6 | Husband and Wife's respective Northwestern Term Life Policies (H) and (W) | $0.00 | $0.00 |
| 7 | 1997 Ford Truck (H) | | $4,000.00 |
| 8 | 2007 Lexus (H) | | $13,979.00 |
| 9 | Allegacy Federal Credit Union (H) | | $1,573.76 |
| 10 | Loan repayment by Dawn Mistretta (H) | | $3,000.00 |
| 11 | Husband's SF&G Employees Retirement Plan | $77,886.55 | $77,886.56 |
| 12 | Husband's Womble Carlyle Savings & Self-Employed Retirement Plan (H) | $113,271.50 | $113,271.50 |
| 13 | Joint SECU Checking (H) | | $2,114.34 |
| 14 | Husband's SECU. x8325 | | $1,918.56 |
| | TOTAL | $251,049.11 | $220,666.09 |

5

NORTH CAROLINA          )          IN THE GENERAL COURT OF JUSTICE
                       )          DISTRICT COURT DIVISION
FORSYTH COUNTY          )          __13__ CVD __4122__


JENNIFER CLELAND GREEN,  )
              Plaintiff  )
vs.                      )          CERTIFICATE OF SERVICE
                         )
STANLEY BOYD GREEN,      )
              Defendant. )

I certify that a copy of the foregoing or attached Equitable Distribution Judgment and Order was received and served as follows:

**Date and Time Served:**   Signed order received from Judge Lillian Jordon, 2/22/2016
                            By US Mail Service and served to party on 2/22/2016

**Person Served:**   Michael F. Schilawski, Attorney at Law

**Manner of Service:**

      [ ]   Personal Service by delivering to the above-named individual a copy of the aforesaid Order.

      [X]   First Class Mail addressed to the party and/or the party's attorney at the last known address contained in the above-captioned court file.

**The Above-Named Individual Was Not Served for the Following Reason:**

_____

_____

_____

_____

**Date Received:**   Signed order received by U.S.Mail Service from Judge Lillian Jordan on Monday, February 22, 2016.

**Date of Service:**   Monday, February 22, 2016 by U.S. Mail Service

**Signature of Person Making Service:**

**Name:**   _____
            JULIA B. FRYE
            Trial Court Coordinator
            Forsyth County District Court

ATTEST: A TRUE COPY. Witness my hand and Official Seal
This __22__ day of _February_ , _2016_
Deputy/Assistant Clerk Superior Court Forsyth County, N.C.

**EXHIBIT B**

EXHIBIT B

STATE OF NORTH CAROLINA  IN THE GENERAL COURT OF JUSTICE
            DISTRICT COURT DIVISION
COUNTY OF FORSYTH       13 CVD 4122

                FORSYTH COUNTY, C.S.C.

JENNIFER CLELAND GREEN,
  PLAINTIFF,        ALIMONY
              JUDGMENT
VS.            AND ORDER

STANLEY BOYD GREEN,
  DEFENDANT

   THIS CAUSE came on for hearing before the undersigned Retired Recalled District Court Judge presiding at the January 19-21, 26-28, 2016 civil, non-jury session of the District Court of Forsyth County upon the Plaintiff's claim for alimony. Plaintiff was present in Court and represented by her attorney, Robin J. Stinson. Defendant was present in Court and represented by his attorney, Michael F. Schilawski. Based upon the testimony, documentary evidence, the demeanor of the witnesses, the pleadings, and other documents of record and by a preponderance of the evidence, the Court enters this judgment and order with the following:

**FINDINGS OF FACT**

1. The Plaintiff is a citizen and resident of Forsyth County, North Carolina and the defendant is a citizen and resident of Wake County, North Carolina and both have been residents of the state of North Carolina for at least six months next preceding the institution of this action.
2. Plaintiff and Defendant were married on October 22, 1994 and separated on June 25, 2013. The parties were divorced September 8, 2014.
3. Four children were born of the marriage of the parties: to wit: Stanley Cleland Green, born August 28, 1995 (a junior in college); Jack Lassiter Green (a senior in high school), born October 12, 1997; David Sarber Green, born February 20, 2000 (a sophomore in high school); and Alexander McDevitt Green, born October 3, 2002 (a 7th grader in middle school).
4. Pursuant to the terms of the January 19, 2016 Consent Order for Permanent Child Custody and Permanent Child Support, the parties share joint legal custody of the minor children. Plaintiff has primary physical custody of the minor children. The children spend time with Defendant every other weekend during the school year and every other week during the summer plus dinner at other times. The children share the holidays with the parties. The Defendant pays monthly child support of $3,184.00.

1

He also provides health and dental insurance for the children and pays 75% of the uninsured healthcare expenses.

5.      All parties are properly before the Court and the Court has jurisdiction of the parties and the subject matter of this action.

6.      The Plaintiff brought this action by filing a complaint seeking, among other things, alimony. Plaintiff alleged that she was and is a dependent spouse as defined by NCGS 50-16.1A(2) and that the Defendant was and is a supporting spouse as defined by NCGS 50-16.1A(5). The Plaintiff further alleged the Defendant has committed marital fault. The Defendant was properly served with the complaint and notice of this trial as required by law. He filed an answer denying the Plaintiff's allegations.

7.      The Court has considered the financial needs of the parties, the accustomed standard of living of the parties prior to their separation, the present employment income and other recurring earnings of each party from any source, the income earning abilities of the parties, the separate and marital debt service obligations of the parties, those expenses reasonably necessary to support each of the parties, and each party's legal obligation to support any other person.

8.      The Plaintiff graduated from law school in 1992 and clerked for Judge Joe John at the NC Court of Appeals for 2 to 3 years. She has not practiced law since except for a few weeks writing subrogation letters early in the parties' marriage. The Plaintiff has not worked outside of the home since the birth her first son in August of 1995 except for these referenced few weeks. In 2000 she and the Defendant agreed for her to allow her law license to become inactive. She has spent the last 20 years caring for the 4 sons of the parties.

9.      Defendant is a licensed attorney and works in Winston Salem and Raleigh, NC. He attended law school after the parties were married. He clerked for Judge Joe John at the NC Court of Appeals for one year before being hired by Womble Carlyle in Winston Salem in September 1999. In 2009 he joined the law firm of Strauch Fitzgerald & Green P.C. as a founding partner. The other two members of the firm had practiced with the Defendant at Womble Carlyle. The Firm is a corporation that distributes all profits as income to the owners in order to avoid paying corporate taxes.

10.     The Plaintiff is 50 years old and the Defendant is 45 years old and both are in good health. They were married 18 years 8 months at the time of the separation.

11. The Plaintiff filed and presented to the Court a financial affidavit, which was received in evidence. On the affidavit she listed her personal financial expenses as $8789.26. The Court has adjusted and disallowed some of these expenses based upon more current evidence. She has a new car so the court adjusted her car maintenance monthly amount to $75.00. Even though the marital residence distributed to the Plaintiff is old, $860.94 per month for maintenance is a lot so this figure has been adjusted to $500.00 per month. This reduces her percentage of the total shared family expenses from $4,219.78 to $3901.65.

2

12. To Plaintiff's Financial Affidavit, the Court made the following adjustments to the section identified as Individual Monthly Expenses: The Plaintiff's health insurance is now $985.00 per month instead of the $712.94 listed on the affidavit. The amount on the affidavit for clothing includes clothing for the children so that amount is adjusted downward to $200.00 per month. The uninsured medical and dental and prescription drugs items also include the children and those figures are reduced to a total of $75.00 per month. The monthly amount for gifts of $665.60 is too extravagant. That would be almost $8000.00 per year. A more reasonable amount considering there are four children is $4800.00 per year or $400.00 per month. With these changes her individual expenses are $4123.67.

13. Except for the debts owed to her family, the Plaintiff's monthly debts are included in the expenses above except for TJ Maxx and that is included in the clothing allowance. The Plaintiff's reasonable and necessary monthly needs, after the adjustments and disallowances above are $8025.00 rounded and this includes taxes of $664.42 for estimated taxes she will incur on alimony.

14. The Court has considered the evidence presented by the parties regarding the tax consequences to the Plaintiff of receiving alimony. Based upon the evidence regarding the tax consequences of alimony the Court adds $286.00 more per month for taxes Plaintiff will incur in receiving taxable alimony, making the Plaintiff's reasonable and necessary monthly needs $8311.00.

15. The Plaintiff's reasonable monthly needs for the three children are $3795.00 after deducting for the orthodontist who has been paid in full and reducing vacations by $50.00 per month per child. The child support paid by the Defendant is $3184.00 per month per the previously referenced court order.

16. The Defendant filed and presented to the Court a financial affidavit, which was received in evidence. The affidavit listed regular recurring monthly expenses totaling $9,081.62 and individual monthly expenses of $10,885.77 and expenses for the children of $3123.24 for total monthly expenses of $23,090.63.

17. The Defendant listed on his affidavit the total paid for the monthly bills for the home he owns with his new wife where he lives with her and her two children. He testified that she is a lawyer in his law firm and earned $350,000.00 in 2015.

18. The Court disallowed, as unreasonable and unnecessary, 60% of the household expenses enjoyed by his wife and her two daughters. This includes $1360.80 for the mortgage payment on the house purchased by Defendant subsequent to the date of separation with a one half net value of $108,951.54, $171.60 for house maintenance and repair; $128.10 for electricity, $69.00 for Gas/Heating Oil, $97.99 for telephone, $73.48 for water, $74.40 for cable, $36.82 for internet service, $180.00 for house cleaning service, and $48.45 for pest control. In addition the court is reducing the food at home by $1478.20 to $400.00 since the Defendant also

listed that he spends $2000.00 per month for food away from home. The court is reducing the category "Other" to $800.00 per month from $1878.20. His rent in Winston Salem for a place to use part time is now $500.00 per month and not the $850.00 listed. Also he included dues to social clubs and he did not belong to these during the marriage. The Court finds that the Defendant's regular recurring monthly expenses for himself total $4241.00 rounded.

19. In addition, the Court disallowed from the listing in his Affidavit of individual monthly expenses, as unreasonable and unnecessary the $2759.30 listed for other insurance premiums for life insurance upon which the Plaintiff and the children are not designated beneficiaries, $1000.00 of the $2000.00 listed for food away from home, and $3000.00 of the $5029.63 listed for retirement and investment. The Defendant's reasonable individual needs, after these disallowances, are $5097.00 rounded.

20. The Court finds that the Defendant's average monthly reasonable and necessary expenses total $9338.00.

21. The Defendant has listed as debts a vehicle loan of $58,900.32 for a vehicle he purchased before this trial and subsequent to the parties' separation. His monthly payment of $1100.00 is included in his recurring monthly expenses above. His listed student loan is also already included in the individual monthly expenses above. He lists a loan payment for a boat he purchased 2 to 3 months before this trial with a balance of $50,655.00 after a $10,000.00 down payment on the boat for a monthly payment of $327.07. At about the same time he purchased a ½ interest in a boat slip at the beach for $34,500.00 cash. He also listed a car payment for a car for his new wife's nanny for her two daughters in the amount of $368.68 per month. He also lists 2 credit card payments, one of which is for a credit card in his new wife's name alone. The monthly payment on the credit card in his name is $260.00 and has a balance of $12,036.04. The court finds that the Defendant has high monthly debts that are extravagant and unnecessary and are voluntary in nature.

22. The defendant has listed on his affidavit expenses for his four sons in addition to the child support of $3184.00 he pays each month. The Court finds that he has already been given credit for his health and dental insurance premiums and that other expenses he listed are either voluntary in nature or extravagant. The Court finds that $1800.00 per month is a reasonable amount for these expenses.

23. The Plaintiff is employed part time and has gross monthly income of $1868.92 per month and net income of $1505.98.

24. The Defendant is one of two owners of his law firm and his gross monthly income in 2014 averaged $24,333.00. In 2015 his monthly income averaged $42,458.00 (excluding a contingency fee payment he received in the Spring of 2015.) His affidavit lists his average gross monthly income as $23,280.00. Using the averages on his end of year income statements for 2014 and 2015 for mandatory deductions, the Court finds that his average

4

gross monthly income for 2014 and 2015 was $33,395.00. His average monthly mandatory deductions were $14,012.00 and his net wages were $19,383.00.

25. The Defendant has an investment account at Northwestern Mutual that had an investment total as of December 16, 2015 of $1,275,268.80. The parties stipulated that $916,433.00 is owed in federal and state taxes on the very large contingency fee the Defendant received after the date of separation which the Court ruled was part divisible property in the Equitable Distribution case.

26. The Defendant is a supporting spouse. He is the person the Plaintiff is actually substantially dependent upon for her maintenance and support. He is the person from whom the Plaintiff is substantially in need of maintenance and support. He is 45 years old and is in good health. The Defendant and the Plaintiff testified that during the marriage the Defendant paid for all the living expenses for the family, including all expenses for health and dental and life insurance for both parties, paid all utilities each month on the marital residence, paid for cable TV, and the internet, paid for all the maintenance on the home and paid for the landscaping expenses or did it himself, provided the Plaintiff with a car to drive, paid for the food, paid for vacations and entertainment, and paid the property taxes and home owners insurance, paid for all of the other household and personal expenses of the Plaintiff and the four children. The Court so finds. The Court finds that the Defendant estimated that the household expenses averaged around $10,000.00 per month prior to the separation which does not take into consideration Plaintiff's post-date of separation expenses of having to purchase a substitute vehicle to drive and to obtain her own health insurance following the divorce, and that income taxes she must pay on any alimony she receives.

27. The Plaintiff is a dependent spouse, in that she is and has been actually substantially dependent upon Defendant for her maintenance and support throughout the parties' marriage and through the present time, and she is substantially in need of support and maintenance from the Defendant. She is 50 years old and is in good health, but has not worked outside the home in at least 19 years until she took a part time job after the parties separated.

28. During the marriage, the parties enjoyed a comfortable standard of living, living in a 60 plus year old house large enough to accommodate their children; they enjoyed nice vacations and were able to afford Plaintiff not working during the marriage and being a stay at home wife. Plaintiff made substantial contributions to the family as a homemaker and mother. Because Plaintiff was a fulltime homemaker and mother for 20 years and is now age 50, her earning power has been negatively impacted.

29. Following trial, the Court entered an Equitable Distribution Judgment and Order ("ED Judgment and Order") herein on February 22, 2016. The terms of said ED Judgment and Order, and the Findings of Fact contained therein, are incorporated herein by reference.

30. Plaintiff has been distributed marital property and divisible property in the ED Judgment and Order which totals a net of $622,059.34 after being credited with the marital debts distributed to her. She also was granted a distributive award of $154,076.57 for a total of $776,135.91 that is 53% of the marital estate. The property that was distributed to her in the Equitable Distribution case includes $41,867.00 for the net equity in the marital residence, $4,667.00 for the divisible property in the marital residence, $14,928.59 which is the passive appreciation of her T Rowe IRA, $318,287.50 which is one half of the marital portion of the Cruise Case fee Defendant received, and $251,049.00 for the items from Exhibit A attached to the Equitable Distribution Judgment.

31. In addition to the marital and divisible assets distributed in the ED Judgment, the Plaintiff owns the following separate property: AT&T/VGTMA stock worth $19,412.55, Comcast /VGTMSA stock worth 1,069.43, Sun Trust Stock worth $15,799.55, T. Rowe Price IRA worth $47,974.38, about $7000.00 in First Citizens accounts and $992.72 in the SECU for a total of approximately $92,000.00 in separate property.

32. The Plaintiff was distributed 53% of the total net estate of $1,464,407.38 and the Defendant was distributed 47%. The Plaintiff's 53% share was $776,135.91 and Defendant's share was $688,271.47.  With the distributive award she is to receive from the Defendant of $154,076.57 plus the cash of $318,287.50 he has to pay to her from the deferred compensation he received after the date of separation and not counting any retirement accounts, the Plaintiff should have at least $150,000.00 to $200,000.00 to invest after she pays her debts and attorney fees. In addition she has some separate investments. Her investment income should be around $600.00 per month.

33. The Plaintiff owes her father at least $266,668.00 that he borrowed from his retirement account that she has to repay. In addition, she has attorney fees incurred during the six days of trial.

34. In order to meet her monthly reasonable and necessary living expenses, after applying her own earnings, Plaintiff need alimony from Defendant in the amount of $6000.00 per month.

35. The Court finds that an appropriate gross amount for the Defendant to pay the Plaintiff as alimony is the sum of  $6000.00 per month. This sum is reasonable and necessary to provide the Plaintiff with the funds needed to meet her reasonable needs according to her accustomed standard of living. Defendant has the means and ability to pay alimony of $6,000.00 per month to Plaintiff.

36. Defendant offered evidence showing, if he earns $330,146.00 annually (as opposed to $400,000.00 annually) if he pays $5300.00 in taxable alimony per month, and he pays $3184.00 per month in child support, he will have $9,304.00 per month to meet his own living expenses.

37. Since this was a marriage of about 20 years, and considering that the Plaintiff is now 50 years old with no real career history and that she will still have two minor children still at home, it is reasonable and appropriate that alimony continue until the death of either party or the Plaintiff's remarriage or cohabitation as set forth in NCGS 50-16.9, whichever should first occur.

38. Subsequent to filing his Answer herein, Defendant admitted and stipulated that he committed acts of illicit sexual behavior during the marriage and prior to the date of separation. Since Plaintiff is a dependent spouse and Defendant is a supporting spouse, Plaintiff is entitled to an award of alimony pursuant to the terms of N.C.G.S. 50-16.3A(a).

39. Based upon the factors set forth in N.C.G.S. 50-16.3A and the Court's discretion, the award of alimony as ordered herein is equitable under the circumstances of this case.

40. The Defendant has the ability to pay the support ordered herein.

41. Based upon and after giving due consideration to the evidence presented by the parties on the various factors set forth in N.C.G.S. 16-.3A(b), the Court concludes that the resources of the Plaintiff are not adequate to meet her reasonable needs and that she is entitled to the award of alimony set forth herein.

42. From the date of the parties' separation in June 2013 through June 2014, Defendant paid Plaintiff no spousal support other than providing her with health and dental insurance, which he did until the date of the Judgment of Absolute Divorce. From July 2014 through June 2015, Defendant paid Plaintiff voluntary spousal support of $2,200.00 per month. From July 2015, Defendant paid Plaintiff voluntary spousal support of $3216 per month. On September 18, 2015, an Order for Prospective Post Separation Support was entered herein which provided, in relevant part, that Defendant would pay Plaintiff post separation support of $5000.00 per month commencing October 1, 2015. Since the date of separation and through January 2016 (a total of 32 months), the Defendant has paid to the Plaintiff in cash the total sum of $56,348.00 in spousal support. He also provided her with health insurance and dental insurance for more than a year, until divorce

43. The Plaintiff is entitled to back alimony in a lump sum of $103,652.00 to help her pay back money she has had to borrow in order to subsist. The retroactive alimony is based upon $5000.00 per month back to the time of filing minus the actual cash paid by the Defendant to the Plaintiff during that time. This is the amount of post separation support the parties agreed to in a consent order filed in this case in October 2015.

44. Plaintiff presented evidence that the Defendant committed marital misconduct by participating in acts of adultery and/or illicit sexual behavior during the marriage and before the date of separation. The Defendant has admitted these acts and the Court so finds.

7

45. The Defendant did not present any evidence of marital misconduct on the part of the Plaintiff. In stead, he testified that she is a wonderful mother and homemaker and the court so finds.

46.     The Court considered this evidence and determined that the alleged marital misconduct, the age of the Plaintiff and her lack of a career directly affect the duration and the amount of the alimony award set forth herein.

47.     Since the Court has determined that the Plaintiff is   entitled to the relief demanded pursuant to N.C.G.S. 50-16.3A, is the dependent spouse, and was and is without means to subsist during the prosecution of the suit and to defray the necessary expenses thereof except through depletion of her estate and borrowed money, she is entitled to an award of attorney fee pursuant to N.C.G.S. 50-16.4.

48.     Her attorney of record, Robin J. Stinson, has submitted to the Court an affidavit. Robin J. Stinson has been licensed as an attorney by the N.C. State Bar since 1984; she is a NC State Bar-certified family law specialist; and she is a fellow in the American Academy of Matrimonial Lawyers. Her normal hourly rate is $325.00 per hour and this hourly rate is normal, customary, and reasonable for an attorney possessing the hears of experience and expertise of Robin J. Stinson. In addition, as indicated in Plaintiff's Affidavit, she was assisted by other members of her firm including paralegals. The total number of hours expended by Plaintiff's counsel in the prosecution of Plaintiff's claim for alimony, including the hours expended by counsel's law partners and paralegals who assisted her in the alimony case, totaled over 206.15 hours up and through January 16, 2016, which is not unreasonable given the length of time this case has taken from the filing of the Complaint through trial. Subsequent to the date referenced in the Affidavit, counsel was in court for the trial of the alimony and equitable distribution matters for 6 days, including a substantial portion of those days in court dealing with issues relating to the equitable distribution claim.

49.     In Plaintiff's attorney's Affidavit, she is requesting an attorney's fee award of $48,384.43 for time spent on the alimony case only up and through January 16, 2016. Some of the charges appear to apply to both the Equitable Distribution case and the alimony case.

50.     In the discretion of the Court, Plaintiff should be awarded $40,000.00 in attorney fees for the prosecution of her alimony claim against Defendant. Said amount of attorney fees is a reasonable amount of fees to be paid by Defendant on Plaintiff's behalf.


## CONCLUSIONS OF LAW

1.     All parties are properly before the Court and the Court has jurisdiction of the parties and the subject matter of this action.

2.     The parties are divorced, and the Plaintiff's alimony claim was filed prior to their divorce.

3.  The Plaintiff is a dependent spouse in that she is actually substantially dependent upon the Defendant for her maintenance and support and is substantially in need of maintenance and support from Defendant.

4.  The Defendant is a supporting spouse upon whom the Plaintiff is actually substantially dependent for maintenance and support and from whom Plaintiff is substantially in need of maintenance and support.

5.  The Plaintiff is in need of and is entitled to an award of alimony from the Defendant.

6.  The Defendant participated in acts of illicit sex acts prior to the separation of the parties.

7.  Based upon the factors set forth in N.C.G.S. 50-16.3A and in the Court's discretion, the award of alimony as ordered herein is equitable under the circumstances of this case.

8.  The Defendant has the means and ability to pay alimony as set forth herein after due consideration to the economic factors set forth in NCGS 50-16.9A(B) until the death of either party or the Plaintiff's remarriage or cohabitation as forth in NCGS 50-16.9, whichever should first occur.

9.  The Plaintiff as the dependent spouse is entitled to an   award of attorney fees.

10. The plaintiff is entitled to an award of a portion of her attorney fees in that Plaintiff is entitled to the relief prayed for in her Complaint for alimony, she is a dependent spouse, and she was and is without sufficient means to subsist during the prosecution of her suit for alimony and to defray the necessary expenses.  The amount of attorney fees ordered here is reasonable under the circumstances.

11. Any finding of fact that would be an appropriate Conclusion of Law is incorporated herein by reference.

**IT IS, THEREFORE, ORDERED ADJUDGED, AND DECREED AS FOLLOWS:**

1.   Beginning on March 1, 2016, and on or before the first day of each month thereafter, the Defendant shall pay the sum of  $6000.00          each month to the Plaintiff as alimony, such alimony to terminate upon the earliest to occur of the following:  the death of either party, or the Plaintiff's remarriage or cohabitation as set forth in NCGS 50-16.9.

2.   The Defendant shall pay to the Plaintiff as retroactive alimony the sum of $103,652.00.00 to be paid in full on or before June 1, 2016.

3.   The Defendant shall pay to Plaintiff's attorney partial fees in the amount of $40,000.00 to be paid on or before May 1, 2016.

4.    The Court retains jurisdiction over this matter pursuant to NCGS 50-16.9 and other relevant statues.

This the 26th day of February, 2016

_Lillian B Jordan_
Judge Presiding
13 CVD 3750

**EXHIBIT C**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.:   16-02105-5-SWH |
| **STANLEY BOYD GREEN** | ) | |
| | ) | |
| **DEBTOR** | ) | **CHAPTER 13** |

**AMENDMENT TO SCHEDULE D**

**NOW COMES** the Debtor and amends schedule D of his petition.  By way of explanation for the amendment, the Debtor has amended the values of the collateral securing his two vehicle loans and his boat loan.  The Debtor has increased the value, in compliance with 11 U.S.C. §506(a)(2) to reflect the price at which a retail merchant (used car dealership or used boat dealership) would charge for the collateral.  His original schedules inaccurately utilized the trade-in values.

| Creditor | Amount of Claim | Description of Collateral | Value of Collateral | Secured Claim | Unsecured Claim |
|---|---|---|---|---|---|
| Bank of America | $19,258.89 | 2013 Toyota Camry | $17,400.00 | $17,400.00 | $1,858.09 |
| PNC Bank | $55,026.95 | 2015 Chevrolet Suburban | $58,500.00 | $55,026.95 | $0.00 |
| US Bank | $50,287.00 | 2015 Scout Durado Boat and Yamaha Motor | $53,000.00 | $50,287.00 | $0.00 |

Dated: 09/19/16                          S/: William E. Brewer, Jr.
                                         William E. Brewer, Jr., Bar No. 7018
                                         311 E. Edenton Street
                                         Raleigh, NC 27601
                                         (919) 832-2288


                              VERIFICATION

I have read the Amendment to Schedule D, and I declare under penalty of perjury that the

information is true and correct.


Date: 09/19/16                           S/: Stanley Boyd Green

                                         Stanley Boyd Green

Case 16-02105-5-SWH    Doc 41    Filed 09/20/16    Entered 09/20/16 13:50:10    Page 3 of 3

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

| | | |
|---|---|---|
| **IN RE:** | ) | **CASE NO.:   16-02105-5-SWH** |
| **STANLEY BOYD GREEN** | ) | |
| | ) | |
| **DEBTOR** | ) | **CHAPTER 13** |

## CERTIFICATE OF SERVICE

I, Kelly C. Newcomb, of 311 E. Edenton Street, Raleigh, North Carolina, certify that I am, and at all times hereinafter mentioned, was more than 18 years of age and that I served a copy of the attached Amendment to Schedule D on the names listed below by depositing a copy thereof in the United States mail, postage prepaid, addressed as follows:

The following were served via electronic service:

Terri Gardner, Attorney for Jennifer Cleland

John F. Logan, Chapter 13 Trustee

I declare under penalty of perjury that the foregoing is true and correct.

This the 20th day of September, 2016.

S/: Kelly C. Newcomb
Kelly C. Newcomb

**EXHIBIT D**

2016009285    00120
FORSYTH CO, NC FEE $26.00
NO TAXABLE CONSIDERATION
PRESENTED & RECORDED:
03-16-2016 03:30:07 PM
C. NORMAN HOLLEMAN
REGISTER OF DEEDS
BY: RANDY L SMITH
DPTY

BK: RE 3276
PG: 642-644

## NORTH CAROLINA SPECIAL WARRANTY DEED

Excise Tax: $NTC

Parcel Identifier No. 6816-92-2028.00

Verified by_____County on the_____day of_____20___

By:_____

Mail/Box to: Bell, Davis & Pitt, P.A., Register of Deeds Box 106

This instrument was prepared by: Robin J. Stinson (no title search requested)

Brief description for the Index: Tax Lot 011, Block 2495, Spring Garden Development

THIS DEED made this_____day of February 2016, by and between

| GRANTOR | GRANTEE |
|---|---|
| Stanley B. Green and wife,<br>Dawn Mistretta<br>913 Thompson Glenn Place<br>Wake Forest, NC 27587 | Jennifer Cleland<br>2733 Spring Garden Road<br>Winston-Salem, NC 27106 |

Enter in appropriate block for each Grantor and Grantee: name, mailing address, and, if appropriate, character of entity, e.g. corporation or partnership.

The designation Grantors and Grantees as used herein shall include said parties, their heirs, successors, and assigns, and shall include singular, plural, masculine, feminine or neuter as required by context.

WITNESSETH, that the Grantors, for a valuable consideration paid by the Grantees, the receipt of which is hereby acknowledged, has and by these presents does grant, bargain, sell and convey unto the Grantee in fee simple, all that certain lot, parcel of land situated in Winston-Salem, Forsyth County, North Carolina and more particularly described as follows:

BEING KNOWN AND DESIGNATED as Lot No. 11 of SPRING GARDEN DEVELOPMENT, as recorded I Plat Book 16, Page 132, Forsyth County Registry, North Carolina, reference to which is hereby made for a more particular description.

BEING INFORMALLY know as Tax Lot 011, Block 2495, Forsyth County Tax Records.

The purpose of this deed is to convert the title of the above-described tract(s) of land from the joint names of the Grantor and the Grantee as joint tenants (formerly as tenants by the entirety) to the sole and separate name of the Grantee, Jennifer Cleland, who shall hereafter retain said tract(s) of land as her sole and separate property, free and clear of any and all claims thereto by the Grantor, Stanley B. Green, pursuant to the terms and provisions of the Equitable Distribution Judgment and Order entered in the Forsyth County, North Carolina District Court Action, File Number 13 CVD 4122.

Dawn Mistretta executes this Deed for the sole purpose of releasing any marital or other interest she may have in and to the property described herein as a result of her marriage to Stanley B. Green.

All or a portion of the property herein conveyed _____ includes or  X  does not include the primary residence of Grantors.

A map showing the above described property is recorded in Plat Book 16 page 132, Forsyth County Registry.

TO HAVE AND TO HOLD the aforesaid lot or parcel of land and all privileges and appurtenances thereto belonging to the Grantee in fee simple.

And the Grantor covenant with the Grantee, that Grantor has done nothing to impair such title as Grantor received, and Grantor will warrant and defend the title against the lawful claims of all persons claiming by, under or through Grantors, other than the following exceptions:

Ad valorem taxes for the current year and subsequent years; easements, restrictions and other matters of record; zoning and other land use rules, laws and regulations; and matters that would be disclosed by an inspection and/or accurate survey of the property.

IN WITNESS WHEREOF, the Grantor has duly executed the foregoing as of the day and year first above written.

Stanley B. Green                                          Dawn Mistretta
Date: _____3/9/16_____                       Date: _____3/9/16_____

STATE OF NORTH CAROLINA – COUNTY OF _____WAKE_____
I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she voluntarily signed the foregoing document for the purpose stated herein and in the capacity indicated: *Stanley B. Green*

Date: _____3/9/16_____

(Official Seal)

ROBERT WESTON
Notary Public, North Carolina
Wake County
My Commission Expires
October 26, 2019

_____
Official Signature of Notary

ROBERT W. WESTON
Notary's printed or typed name
My commission expires: _____10/26/19_____

**Book 3276  Page 644**

STATE OF NORTH CAROLINA – COUNTY OF _WAKE_____

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she voluntarily signed the foregoing document for the purpose stated herein and in the capacity indicated: *Dawn Mistretta*

Date: _3/9/16_____

_____
Official Signature of Notary

(Official Seal)

_____
Notary's printed or typed name

My commission expires: _10/26/19_____

ROBERT WESTON
Notary Public, North Carolina
Wake County
My Commission Expires
October 26, 2019

**EXHIBIT E**

**Fill in this information to identify the case:**

Debtor 1 Stanley Boyd Green

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Eastern District of North Carolina

Case number 16-02105-5-SWH

Read the instructions before filling out this form. Use this form to make a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment. A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Official Form 410
# Proof of Claim

04/16

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Wells Fargo Bank, N.A.

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Wells Fargo Bank, N.A.
Default Document Processing
MAC # N9286-01Y

Name

1000 Blue Gentian Road

| Number | Street |
| --- | --- |

Eagan MN 55121-7700

| City | State | ZIP Code |
| --- | --- | --- |

Contact phone  800-274-7025

Contact email  POCNOTIFICATIONS@WELLSFARGO.COM

**Where should payments to the creditor be sent?** (if different)

Wells Fargo Bank, N.A.
Attention: Payment Processing
MAC# X2302-04C

Name

1 Home Campus

| Number | Street |
| --- | --- |

Des Moines IA 50328

| City | State | ZIP Code |
| --- | --- | --- |

Contact phone  800-274-7025

Contact email  POCNOTIFICATIONS@WELLSFARGO.COM

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

W F C M G F 1 6 0 2 1 0 5 N C E 0 8 5 8 7 8 2 8

Official Form 410                              **Proof of Claim**                              page 1

**4. Does this claim amend one already filed?** ☒ No ☐ Yes. Claim number on court claims registry (if known) _____ Filed on _____
MM/DD/YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?** ☒ No ☐ Yes. Who made the earlier filing? _____

---

**Part 2:  Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**
☐ No
☒ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: 7828

**7. How much is the claim?** $ 344,587.44 _____  **Does this amount include interest or other charges?**
☐ No
☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**
Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Money Loaned

**9. Is all or part of the claim secured?**
☐ No
☒ Yes. The claim is secured by a lien on property.

Nature of property:
☒ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe:    2733 SPRING GARDEN ROAD  WINSTON SALEM NC 27106

_____

Basis for perfection:    Recorded Mortgage/Deed of Trust

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:    $ _____
Amount of the claim that is secured:    $ 344,587.44
Amount of the claim that is unsecured:    $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $ 1,154.50

Annual Interest Rate (when case was filed)  3.625   %
☒ Fixed
☐ Variable

**10. Is this claim based on a lease?**
☒ No
☐ Yes.  Amount necessary to cure any default as of the date of the petition.  $ _____

**11. Is this claim subject to a right of setoff?**
☒ No
☐ Yes.  Identify the property: _____

---

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☒ No | | Amount entitled to priority |
|---|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check all that apply:* | | |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $ _____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor.s business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $ _____ |
| | * Amounts are subject to adjustment on 4/1/19 and every 3 years after that for cases begun on or after the date of adjustment. | | |

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.** 18 U.S.C. §§ 152, 157 and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   8/8/2016
                  MM / DD / YYYY

/s/ Daria Anne Barrett

Signature

**Print the name of the person who is completing and signing this claim:**

Name      Daria Anne Barrett
          First name          Middle name          Last name

Title     Attorney for Secured Creditor

Company   Brock & Scott, PLLC
          Identify the corporate servicer as the company if the authorized agent is a servicer.

Address   5121 Parkway Plaza Blvd. Suite 300
          Number        Street

          Charlotte, NC 28217
          City                    State    ZIP Code

Contact phone  (704) 369-0676    Fax: (954) 618-6954

Email     bankruptcy@brockandscott.com

## Mortgage Proof of Claim Attachment

If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim. See separate instructions.

(12/15)

### Part 1: Mortgage and Case Information

| | |
|---|---|
| Case number: | 16-02105-5-SWH |
| Debtor 1: | Stanley Boyd Green |
| Debtor 2: | |
| Last 4 digits to identify: | 7928 |
| Creditor: | See 410 part 1.1 |
| Servicer: | Wells Fargo Bank, N.A. |
| Fixed accrual/daily simple interest/other: | Fixed Accrual |

### Part 2: Total Debt Calculation

| | |
|---|---|
| Principal balance: | 348,154.24 |
| Interest due: | 691.54 |
| Fees, costs due: | 0.00 |
| Escrow deficiency for funds advanced: | 0.00 |
| Other: | 0.00 |
| Less total funds on hand: | — 4,258.34 |
| Total debt: | 344,587.44 |

*Not to be used for payoff purposes

### Part 3: Arrearage as of Date of the Petition

| | |
|---|---|
| Principal & interest due: | |
| Prepetition fees due: | 0.00 |
| Escrow deficiency for funds advanced: | 0.00 |
| Projected escrow shortage: | 1,154.50 |
| Other: | 0.00 |
| Less funds on hand: | 0.00 |
| Total prepetition arrearage: | — 1,154.50 |

### Part 4: Monthly Mortgage Payment

| | |
|---|---|
| Principal & interest: | 1,698.79 |
| Monthly escrow: | 676.60 |
| Private mortgage insurance: | 0.00 |
| Optional Products: | 0.00 |
| Total monthly payment: | 2,375.39 |

*Additional charges to the monthly payment amount may be required because interest rate adjustments or escrow requirement changes.

### Part 5: Loan Payment History from First Date of Default

| | | Account Activity | | | | How Funds Were Applied/Amount Incurred | | | | | | Balance After Amount Received or Incurred | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A. | B. | C. | D. | E. | F. | G. | H. | I. | J. | K. | L. | M. | N. | O. | P. | Q. |
| Date | Contractual payment amount | Funds received | Amount incurred | Description | Contractual due date | Contractual Prin, int & esc past due balance | Amount to principal | Amount to interest | Amount to escrow | Amount to fees or charges | Unapplied funds | Principal balance | Accrued interest balance | Escrow balance | Fees / Charges balance | Unapplied funds balance |
| 04/20/2016 | | | | Beginning Balances | 05/01/2016 | 0.00 | | | | | | 348,154.24 | | 0.00 | 4,258.34 | 0.00 |
| 04/20/2016 | | | | Bankruptcy Filed | 05/01/2016 | 0.00 | | | | | | 348,154.24 | | 0.00 | 4,258.34 | 0.00 |

**Addendum Page**

Basis for asserting that the applicable party has the right to foreclose: Debtor(s) executed a promissory note secured by a mortgage, deed of trust, or security deed. The Promissory note is either made payable to creditor or has been duly indorsed. Creditor, directly or through an agent, has possession of the promissory note. Creditor is the original mortgagee or beneficiary or the assignee of the mortgage, deed of trust, or security deed.

**Additional Disclaimers (where applicable)**

**410**

>> Part 2: Question 9-Describe contains the property address and may contain a description for "Other".

**410A**

>> **Part 1:**

>> Full creditor name cannot be displayed due to space limitation, see 410 part 1.1 for full name.

>> **Part 2:**

>> Principal Balance is from Part 5, Column M as of the Bankruptcy File Date.

>> Interest Due is the interest due as of the Bankruptcy File Date.

>> Fees, costs due is from Part 5, Column P as of the Bankruptcy File Date and includes any outstanding fees (i.e. late charges, property inspections) and cost (i.e. attorney costs), also included are corporate advances (i.e. tax, insurance) for non-escrowed loans as of the Bankruptcy File Date. Any fees, costs due that are incurred pre-petition and waived post-petition will not be included.

>> Escrow deficiency for funds advanced is from Part 5, Column O (if negative balance) as of the Bankruptcy File Date.

>> Other includes any applicable Private Mortgage Insurance, other Optional Products (i.e. A & H, Life) or Deferred Interest, where applicable, due as of the Bankruptcy File Date. This line was added to ensure transparency.

>> Less Total Funds on hand is the total of Part 5, Column O (if positive balance) and Q as of the Bankruptcy File Date.

>> Total Debt not to be used for payoff purposes.

>> **Part 3:**

>> Principal and Interest is the principal and interest portion of Part 5, Column G, as of the Bankruptcy File Date. (If post-petition payments are included as required by Local Rule or practice, this field will include post-petition principal and interest amounts).

>> Pre-Petition Fees Due is from Part 5, Column P as of the Bankruptcy File Date. Any fees, costs due that are incurred pre-petition and waived post-petition will not be included.

>> Escrow Deficiency for Funds Advanced is from Part 5, Column O (if negative balance) as of the Bankruptcy File Date.

>> Projected Escrow Shortage is the Escrow Required from the escrow analysis minus a positive escrow balance as of the Bankruptcy File Date. (If post-petition payments are included as required by Local Rule or practice, this field will include post-petition escrow amounts).

>> Other includes any applicable Optional Products (i.e. A & H, Life) due as of the bankruptcy file date. This line was added to ensure transparency. (If post-petition payments are included as required by Local Rule or practice, this field will include post-petition Optional Product amounts).

>> Less Funds on Hand is from Part 5, column Q as of the Bankruptcy File Date.

>> **Part 4:**

>> Optional Products includes any applicable optional products (i.e. A & H, Life) due as of the Bankruptcy File Date. This line was added to ensure transparency.

>> (*)This disclaimer has been added to the form to explain that the monthly payment amount may change periodically throughout the life of the loan.

>> **Part 5:**

>> If any of the transactions in the loan payment history contain amounts for optional products, the amount for that product will be reflected in either the Contractual payment amount or the Funds Received amount, and will be applied in those amounts. It will also be reflected in column G as described below.

>> Column G In addition to the items listed, this also includes any past due PMI or optional products (i.e. A & H, Life) amounts, as applicable. Optional product (i.e. A & H, Life) amounts will not be included in columns H-Q due to no appropriate column heading for this type of transaction.

>> Column J includes taxes, insurance and MIP/PMI as applicable.

>> Column N will only be populated if the loan is Daily Simple Interest or if Deferred Interest exists on the account.

>> Column O includes taxes, insurance and MIP/PMI as applicable.

Case 16-02105-5-SWH    Claim 3    Filed 08/09/16    Desc Main Document    Page 6 of 25

**WELLS FARGO HOME MORTGAGE**

Wells Fargo Home Mortgage
PO Box 14547
Des Moines, IA 50306-4547

Page 1 of 3

For informational purposes

**Escrow account disclosure statement and notice of new mortgage payment**

| | |
|---|---|
| Loan number: | |
| Next payment due date: | May 01, 2016 |
| New payment effective date: | May 01, 2016 |
| New payment amount: | $2,375.39 |
| Principal balance: | $348,154.24 |
| Interest rate: | 3.625% |
| Statement date: | April 24, 2016 |
| Account review period: | Apr 2016 - Apr 2016 |
| Customer service: | 1-800-340-0473 |
| Customer service hours: | Mon - Fri  7 a.m. - 8 p.m CT. |

STANLEY B GREEN
JENNIFER C GREEN
2733 SPRING GARDEN RD
WINSTON SALEM NC 27106-5713

We accept telecommunications relay service calls.

Property address:
2733  SPRING GARDEN ROAD
WINSTON SALEM NC 27106

Dear STANLEY B GREEN and JENNIFER C GREEN:

Each year, we review your escrow account to make sure the escrow portion of your scheduled mortgage payment covers your property taxes and/or insurance premiums. Increases or decreases in your annual taxes and/or insurance premiums may cause your mortgage payment amount to change. Here are the details of your most recent escrow account review.

Note: This notice is for informational purposes only and is being provided as a courtesy should you voluntarily decide to make any escrow shortage payment, if applicable. This notice should not be construed as an attempt to collect a debt or a demand for payment contrary to any protection you may have received pursuant to your bankruptcy case.

## New escrow and mortgage payment amount

| New payment effective date | Current payment ($) | New payment ($) |
|---|---|---|
| May 01, 2016[1] | | |
| Principal and/or interest[1] | 1,698.79 | 1,698.79 |
| Escrow payment | 676.60 | 676.60 |
| New escrow shortage/prepayment[2] | | 0.00 |
| **Total payment amount** | **2,375.39** | **2,375.39** |

*1. If you use one of our automatic payment options, we will adjust your electronic withdrawal(s) to ensure your May 01, 2016 payment is made in full.*

*2. If your current payment includes an amount to cover a previous escrow shortage, this amount will be added.  If your current  payment includes an adjustment for extra funds you deposited to your escrow account, this amount will be deducted.*

Your account is in balance. Our calculation has resulted in no projected shortage or overage in your escrow account.

**A guide to your escrow questions and answers is available at:  wellsfargo.com/escrowquestions**

*** This section intentionally left blank ***

For informational purposes                    Loan number: 

**The following information covers your projected escrow account activity from May 2016 to Apr 2017**

**Projected escrow account disbursements**
Annualized items to be paid from your escrow account ($):

| | |
|---|---|
| HAZARD INS | 3,013.00 |
| COUNTY TAX | 5,106.24 |
| Total disbursements | 8,119.24 |
| **Scheduled escrow payment** | **676.60[1]** |

*1. Your escrow payment is calculated by dividing the total disbursements by 12.*

**Projected escrow account activity for the next 12 months**

| | Anticipated payments ($) | | | Escrow balance ($) | |
|---|---|---|---|---|---|
| Date | To escrow | From escrow | Description | Projected | Required |
| May 2016 | | | Starting balance | 4,258.34 | 5,412.84 |
| May 2016 | 676.60 | 0.00 | | 4,934.94 | 6,089.44 |
| Jun 2016 | 676.60 | 0.00 | | 5,611.54 | 6,766.04 |
| Jul 2016 | 676.60 | 0.00 | | 6,288.14 | 7,442.64 |
| Aug 2016 | 676.60 | 3,013.00 | KEMPER PREFERRED | 3,951.74 | 5,106.24 |
| Sep 2016 | 676.60 | 0.00 | | 4,628.34 | 5,782.84 |
| Oct 2016 | 676.60 | 5,106.24 | FORSYTH COUNTY | 198.70[2] | 1,353.20[3] |
| Nov 2016 | 676.60 | 0.00 | | 875.30 | 2,029.80 |
| Dec 2016 | 676.60 | 0.00 | | 1,551.90 | 2,706.40 |
| Jan 2017 | 676.60 | 0.00 | | 2,228.50 | 3,383.00 |
| Feb 2017 | 676.60 | 0.00 | | 2,905.10 | 4,059.60 |
| Mar 2017 | 676.60 | 0.00 | | 3,581.70 | 4,736.20 |
| Apr 2017 | 676.60 | 0.00 | | 4,258.30 | 5,412.80 |
| **Total** | **8,119.20** | **8,119.24** | | | |

The projected escrow account activity is based on the most recent tax and/or insurance information available as well as the assumption that your payments will be received as agreed.

*2. **Projected low point**. The point during the annual period at which the projected escrow balance will reach its lowest point.*

*3. **Required escrow balance**. To cover unanticipated disbursements, including increases to tax or insurance payments, there is a 2-month minimum escrow balance allowable by state law and/or your mortgage contract. This amount does not include mortgage insurance.*

- *Your 2-month minimum escrow balance is **$1,353.20***
- *State law requires that this minimum escrow balance not exceed **$1,353.20***
- *Note: If you have an adjustable rate mortgage (ARM), you will receive a notice about your new mortgage payment when your ARM rate is scheduled to change.*

**Information about your escrow account**

| | |
|---|---|
| Your lowest projected escrow account balance (low point) ($) | 198.70 |
| **Plus escrow adjustment4 ($)** | 1,154.50 |
| Less your required minimum escrow account balance ($) | 1,353.20 |
| **This means your escrow account is in balance** | **0.00** |

*4. An Escrow Adjustment of $1,154.50, scheduled to be repaid through the bankruptcy, is included in this calculation.*

Page 3 of 3

For informational purposes                     Loan number: 

**The following information covers your escrow account history activity from Apr 2016 to Apr 2016**

| Date | Payments to escrow ($) Projected | Actual | Payments from escrow ($) Projected | Actual | Description | Escrow balance ($) Projected | Actual |
|------|------|------|------|------|------|------|------|
| Apr 2016 | | | | | Starting balance | 4,736.24 | 3,476.79 |
| Apr 2016 | 676.60 | 781.55[1] | 0.00 | 0.00 | | 5,412.84 | 4,258.34 |
| Totals | **676.60** | **781.55** | **0.00** | **0.00** | | | |

1. *Indicates where a difference exists between the projected and actual account activity.*

Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A.
© 2012 Wells Fargo Bank, N.A. All rights reserved. NMLSR ID 399801



**Manage your mortgage payments easily with the Preferred Payment Plan℠**

- Schedule weekly, biweekly, semi-monthly or monthly payments
- Save time and money with free, secure withdrawals
- No due dates to remember or checks to write

It's free, secure and convenient. To enroll, call 1-866-386-8519.

**A guide to your escrow questions and answers is available at: wellsfargo.com/escrowquestions**

**WELLS FARGO HOME MORTGAGE**

**Wells Fargo Home Mortgage**
PO Box 14547
Des Moines, IA 50306-4547

**Escrow account disclosure statement
and notice of new mortgage payment**

| | |
|---|---|
| Loan number: | ▮▮▮ |
| Next payment due date: | March 01, 2016 |
| New payment effective date: | April 01, 2016 |
| New payment amount: | $2,480.34 |
| Shortage amount: | $1,259.45 |
| Principal balance: | $349,442.55 |
| Interest rate: | 3.625% |
| Statement date: | February 09, 2016 |
| Account review period: | Apr 2015 - Mar 2016 |
| Customer service: | 1-800-340-0473 |
| Customer service hours: | Mon - Fri  6 a.m. - 10 p.m. |
| | Sat  8 a.m. - 2 p.m. CT |

We accept telecommunications relay service calls.

Property address:
2733  SPRING GARDEN ROAD
WINSTON SALEM NC 27106

STANLEY B GREEN
JENNIFER C GREEN
2733 SPRING GARDEN RD
WINSTON SALEM NC 27106-5713

Dear STANLEY B GREEN and JENNIFER C GREEN:

Each year, we review your escrow account to make sure the escrow portion of your scheduled mortgage payment covers your property taxes and/or insurance premiums. Increases or decreases in your annual taxes and/or insurance premiums may cause your mortgage payment amount to change. Here are the details of your most recent escrow account review.

Please take a moment to look over your new escrow and mortgage payment details.

**New escrow and mortgage payment amount**

| New payment effective date | Current | New payment ($) | |
|---|---|---|---|
| April 01, 2016[1] | payment ($) | Option 1 | Option 2 |
| Principal and/or interest | 1,698.79 | 1,698.79 | 1,698.79 |
| Escrow payment | 610.32 | 676.60 | 676.60 |
| Escrow shortage/prepayment[2] | 9.02 | 0.00 | 104.95 |
| **Total payment amount** | 2,318.13 | 2,375.39 | 2,480.34 |

1. If you use one of our automatic payment options, we will adjust your electronic withdrawal(s) to ensure your April 01, 2016 payment is made in full.

2. If your current payment includes an amount to cover a previous escrow shortage, this amount will be added. If your current payment includes an adjustment for extra funds you deposited to your escrow account, this amount will be deducted.

**You may use either of the following options to restore your required account balance**

| Option 1: Pay the entire shortage now | Option 2: Pay the shortage over 12 months |
|---|---|
| | **No action required** unless you use a bill pay or 3rd party payment service to pay your mortgage |
| Pay the entire escrow shortage amount of $1,259.45 using the shortage payment coupon and your new mortgage payment will be $2,375.39. | Pay the escrow account shortage of $1,259.45  in 12 payments of $104.95 which we've included in your new payment amount of $2,480.34. |

**Attention bill pay and 3rd party payment service customers:** Notify your service of the change to your mortgage payment.

---

**Shortage payment coupon for loan number:** ▮▮▮▮

*Note: Due to changes in your taxes and insurance, your mortgage payment may increase even if your shortage is paid in full.*



STANLEY B GREEN
JENNIFER C GREEN

Wells Fargo Home Mortgage
PO Box 660278
Dallas, TX 75266-0278

Your escrow account review indicates a shortage of $1,259.45.  For your convenience, we have spread this amount over 12 months and included it in your new scheduled payment. However, you may choose to pay it in full and your mortgage payment will be $2,375.39.

If you choose to pay this shortage in full now, please detach this coupon and mail it along with your check to the address that appears on this coupon. Wells Fargo Bank, N. A. may clear your check electronically. Receipt of your check will authorize us to process your payment as an electronic debit to the account on which the check was written.

*Please do not include this remittance with your mortgage payment.*

*Escrow shortage payment: $1,259.45*
*New mortgage payment if shortage is paid: $2,375.39*

Page 2 of 3

Loan number: ▄▄▄▄▄▄

**The following information covers your projected escrow account activity from Apr 2016 to Mar 2017**

**Projected escrow account disbursements**
Annualized items to be paid from your escrow account ($):

| | |
|---|---|
| HAZARD INS | 3,013.00 |
| COUNTY TAX | 5,106.24 |
| Total disbursements | 8,119.24 |
| **Scheduled escrow payment** | **676.60**[1] |

*1. Your escrow payment is calculated by dividing the total disbursements by 12.*

**Projected escrow account activity for the next 12 months**

| Date | Anticipated payments ($) To escrow | From escrow | Description | Escrow balance ($) Projected | Required |
|---|---|---|---|---|---|
| Apr 2016 | | | Starting balance | 3,476.79 | 4,736.24 |
| Apr 2016 | 676.60 | 0.00 | | 4,153.39 | 5,412.84 |
| May 2016 | 676.60 | 0.00 | | 4,829.99 | 6,089.44 |
| Jun 2016 | 676.60 | 0.00 | | 5,506.59 | 6,766.04 |
| Jul 2016 | 676.60 | 0.00 | | 6,183.19 | 7,442.64 |
| Aug 2016 | 676.60 | 3,013.00 | KEMPER PREFERRED | 3,846.79 | 5,106.24 |
| Sep 2016 | 676.60 | 0.00 | | 4,523.39 | 5,782.84 |
| Oct 2016 | 676.60 | 5,106.24 | FORSYTH COUNTY | 93.75[2] | 1,353.20[3] |
| Nov 2016 | 676.60 | 0.00 | | 770.35 | 2,029.80 |
| Dec 2016 | 676.60 | 0.00 | | 1,446.95 | 2,706.40 |
| Jan 2017 | 676.60 | 0.00 | | 2,123.55 | 3,383.00 |
| Feb 2017 | 676.60 | 0.00 | | 2,800.15 | 4,059.60 |
| Mar 2017 | 676.60 | 0.00 | | 3,476.75 | 4,736.20 |
| **Total** | **8,119.20** | **8,119.24** | | | |

These calculations indicate the projected escrow balance will be less than the required escrow balance. The resulting shortage is $1,259.45. If you choose to pay the shortage in full, the new payment will be $2,375.39.

The projected escrow account activity is based on the most recent tax and/or insurance information available as well as the assumption that your payments will be received as agreed.

*2. Projected low point. The point during the annual period at which the projected escrow balance will reach its lowest point.*

*3. Required escrow balance. To cover unanticipated disbursements, including increases to tax or insurance payments, there is a 2-month minimum escrow balance allowable by state law and/or your mortgage contract. This amount does not include mortgage insurance.*

- *Your 2-month minimum escrow balance is $1,353.20*
- *State law requires that this minimum escrow balance not exceed $1,353.20*
- *Note: If you have an adjustable rate mortgage (ARM), you will receive a notice about your new mortgage payment when your ARM rate is scheduled to change.*

**Information about your escrow account shortage**

| | |
|---|---|
| Your lowest projected escrow account balance (low point) ($) | 93.75 |
| Less your required minimum escrow account balance ($) | 1,353.20 |
| **This means your escrow account has a shortage of ($)** | **1,259.45** |

Page 3 of 3

Loan number: ▆▆▆▆▆▆

**The following information covers your escrow account history activity from Apr 2015 to Mar 2016**

| Date | Payments to escrow ($) Projected | Actual | Payments from escrow ($) Projected | Actual | Description | Escrow balance ($) Projected | Actual |
|---|---|---|---|---|---|---|---|
| Apr 2015 | | | | | Starting balance | 4,272.19 | 4,163.95 |
| Apr 2015 | 610.32 | 619.34[1] | 0.00 | 0.00 | | 4,882.51 | 4,783.29 |
| May 2015 | 610.32 | 619.34[1] | 0.00 | 0.00 | | 5,492.83 | 5,402.63 |
| Jun 2015 | 610.32 | 619.34[1] | 0.00 | 0.00 | | 6,103.15 | 6,021.97 |
| Jul 2015 | 610.32 | 619.34[1] | 0.00 | 0.00 | | 6,713.47 | 6,641.31 |
| Aug 2015 | 610.32 | 619.34[1] | 2,372.00 | 3,013.00[1] | KEMPER PREFERRED | 4,951.79 | 4,247.65 |
| Sep 2015 | 610.32 | 619.34[1] | 0.00 | 0.00 | | 5,562.11 | 4,866.99 |
| Oct 2015 | 610.32 | 619.34[1] | 4,951.79 | 5,106.24[1] | FORSYTH COUNTY | 1,220.64 | 380.09 |
| Nov 2015 | 610.32 | 619.34[1] | 0.00 | 0.00 | | 1,830.96 | 999.43 |
| Dec 2015 | 610.32 | 619.34[1] | 0.00 | 0.00 | | 2,441.28 | 1,618.77 |
| Jan 2016 | 610.32 | 619.34[1] | 0.00 | 0.00 | | 3,051.60 | 2,238.11 |
| Feb 2016 | 610.32 | 619.34[1] | 0.00 | 0.00 | | 3,661.92 | 2,857.45 |
| Mar 2016 est. | 610.32 | 619.34[1] | 0.00 | 0.00 | | 4,272.24 | 3,476.79 |
| **Totals** | **7,323.84** | **7,432.08** | **7,323.79** | **8,119.24** | | | |

1. Indicates where a difference exists between the projected and actual account activity.

Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A.
© 2012 Wells Fargo Bank, N.A. All rights reserved. NMLSR ID 399801



**Manage your mortgage payments easily with the Preferred Payment Plan℠**

- Schedule weekly, biweekly, semi-monthly or monthly payments
- Save time and money with free, secure withdrawals
- No due dates to remember or checks to write

It's free, secure and convenient. To enroll, call 1-866-386-8519.

**A guide to your escrow questions and answers is available at: wellsfargo.com/escrowquestions**



# NOTE

NOVEMBER 19, 2012                    WILMINGTON,                           NORTH CAROLINA
[Date]                               [City]                               [State]

2733 SPRING GARDEN ROAD, WINSTON SALEM, NC 27106
[Property Address]

**1.  BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S.   $372,500.00   (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is  ALPHA MORTGAGE CORPORATION, A NORTH CAROLINA
CORPORATION.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who
is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a
yearly rate of   3.625%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section
6(B) of this Note.

**3.  PAYMENTS**

**(A) Time and Place of Payments**
I will pay principal and interest by making a payment every month.

I will make my monthly payment on the     1ST    day of each month beginning on  JANUARY 1, 2013.
I will make these payments every month until I have paid all of the principal and interest and any other charges described
below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be
applied to interest before Principal. If, on     DECEMBER 1, 2042,       I still owe amounts under this Note, I will
pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
1320 AIRLIE ROAD
WILMINGTON, NC 28403

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**
My monthly payment will be in the amount of U.S.   $1,698.79.

**4.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known
as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate
a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will
use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply
my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to
reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in
the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest
or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any
such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any

Initials: _____

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200 1/01
© 1999-2007 Online Documents, Inc.                    Page 1  of 3                         F3200NOT  0701

sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of      15      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      4.000%
of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.  WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which

Initials: _____

Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (SEAL)
Stanley B Green

_____ (SEAL)
Jennifer G Green

PAY TO THE ORDER OF

WITHOUT RECOURSE

ALPHA MORTGAGE CORPORATION, A
NORTH CAROLINA CORPORATION

BY 
Pamela S. Cox
Secretary

[Sign Original Only]

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200 1/01
© 1999-2007 Online Documents, Inc.                     Page 3   of 3                     F3200NOT  0701

Book 3092 Page 2607

**2012052228 00186**
FORSYTH CO. NC FEE $56.00
PRESENTED & RECORDED
11/26/2012 10:40:28 AM
C. NORMAN HOLLEMAN
REGISTER OF DEEDS
BY: PATSY RUTH DAVIS
DPTY

**BK: RE 3092**
**PG: 2607 - 2616**


*Green, Stanley*
*Wells*

───────────── [Space Above This Line For Recording Data] ─────────────

## DEED OF TRUST

After Recording Return To:
ALPHA MORTGAGE CORPORATION
FINAL DOCUMENT DEPARTMENT
1320 AIRLIE ROAD
WILMINGTON, NC 28403

This instrument was prepared by:
R. Michael Wells

LOAN #: ▮▮▮▮▮▮                                    MIN ▮▮▮▮▮▮

**DEFINITIONS**
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
(A) "Security Instrument" means this document, which is dated    NOVEMBER 19, 2012,    together with all Riders to this document.
(B) "Borrower" is STANLEY B GREEN AND JENNIFER C GREEN, HUSBAND AND WIFE.

Borrower is the trustor under this Security Instrument.
(C) "Lender" is ALPHA MORTGAGE CORPORATION.

Lender is a CORPORATION,                                    organized and existing under the laws of
NORTH CAROLINA.                                    Lender's address is 1320 AIRLIE ROAD,
WILMINGTON, NC 28403.

(D) "Trustee" is PAMELA S. COX.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

NORTH CAROLINA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3034 1/01    Initials: *SCG  SBG*
© 1999-2008 Online Documents, Inc.                    Page 1 of 9                    NCEDEED  0902

Submitted electronically by "Wells Jenkins Lucas & Jenkins PLLC"
in compliance with North Carolina statutes governing recordable documents
and the terms of the submitter agreement with the Forsyth County Register of Deeds.

LOAN #: ▮▮▮▮▮▮

**(F) "Note"** means the promissory note signed by Borrower and dated **NOVEMBER 19, 2012.** The Note states that Borrower owes Lender **\*\*\*THREE HUNDRED SEVENTY TWO THOUSAND FIVE HUNDRED AND NO/100 \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*** Dollars (U.S.   **$372,500.00**   ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **DECEMBER 1, 2042.**
**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider  ☐ Condominium Rider  ☐ Second Home Rider
☐ Balloon Rider  ☐ Planned Unit Development Rider  ☐ Other(s) [specify]
☐ 1-4 Family Rider  ☐ Biweekly Payment Rider
☐ V.A. Rider

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(M) "Escrow Items"** means those items that are described in Section 3.
**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee and Trustee's successors and assigns, in trust, with power of sale, the following described property located in the **COUNTY**                              [Type of Recording Jurisdiction] of **Forsyth**
[Name of Recording Jurisdiction]:


**SEE ATTACHED EXHIBIT "A"**


which currently has the address of **2733 SPRING GARDEN ROAD, WINSTON SALEM,**
                                                                    [Street] [City]

North Carolina      27106            ("Property Address"):
                  [Zip Code]

   TO HAVE AND TO HOLD this property unto Trustee and Trustee's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS

NORTH CAROLINA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3034 1/01
© 1998-2008 Online Documents, Inc.                  **Page    2    of 9**        Initials: 
                                                                          NCEDEED  0803

LOAN #:

holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. If Borrower has breached any covenant or agreement in this Security Instrument and Lender has accelerated the obligations of Borrower hereunder pursuant to Section 22 then Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

NORTH CAROLINA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3034 1/01        Initials: _____
© 1998-2008 Online Documents, Inc.        Page 3 of 9        NCEDEED  0803

LOAN #: ▓▓▓▓

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

NORTH CAROLINA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3034 1/01          Initials: _____
© 1998-2006 Online Documents, Inc.          **Page 4 of 9**          NCDEED 0803

LOAN #: ▮▮▮▮▮▮

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve, if permitted under Applicable Law, in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve, if permitted under Applicable Law. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, if permitted under Applicable Law, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

NORTH CAROLINA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3034 1/01
© 1999-2008 Online Documents, Inc.    Page 5 of 9    Initials: 
NCEDEED  0803

▮▮▮▮▮▮▮▮▮▮

LOAN #:

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for mortgage insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security

NORTH CAROLINA--Single Family--Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT** Form 3034 1/01    Initials: _____

© 1999-2008 Online Documents, Inc.        **Page 6 of 9**        NCEDEED 0803

LOAN #:

Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured

NORTH CAROLINA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3034 1/01    Initials: _____

© 1998-2008 Online Documents, Inc.    Page 7 of 9    NCEDEED 0803

LOAN #

hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, and if it is determined in a hearing held in accordance with Applicable Law that Trustee can proceed to sale, Trustee shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of   5.00%   of the gross sale price; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to

NORTH CAROLINA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3034 1/01
© 1998-2008 Online Documents, Inc.                    Page   8   of   9

Initials: [handwritten initials]
NCEDEED  0603

LOAN #: ▮▮▮▮▮

It. The interest rate set forth in the Note shall apply whether before or after any judgment on the indebtedness evidenced by the Note.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender or Trustee shall cancel this Security Instrument. If Trustee is requested to release this Security Instrument, all notes evidencing debt secured by this Security Instrument shall be surrendered to Trustee. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Attorneys' Fees.** Attorneys' fees must be reasonable.

BY SIGNING UNDER SEAL BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
Stanley B Green

_____ (Seal)
Jennifer C Green

State of NORTH CAROLINA                                          FORSYTH County ss:

I, **Amy Goodin** _____, a Notary Public of the County of FORSYTH, State of North Carolina, do hereby certify that Stanley B Green AND Jennifer C Green, personally appeared before me this day and acknowledged the due execution of the foregoing instrument.

Witness my hand and official seal this **19th** day of **November, 2012**.

My commission expires: **02-12-2014**

_____
Notary Public

```
┌─────────────────────────────┐
│        AMY GOODIN           │
│        NOTARY PUBLIC        │
│        FORSYTH COUNTY       │
│     STATE OF NORTH CAROLINA │
│  MY COMMISSION EXPIRES 2-12-14 │
└─────────────────────────────┘
```

EXHIBIT "A"

**BEING KNOWN AND DESIGNATED as Lot Number 11 of SPRING GARDEN DEVELOPMENT, as recorded in Plat Book 16, Page 132, in the Office of the Register of Deeds of Forsyth County, North Carolina to which map reference is hereby made for a more particular description.**

**2016014999 00133**
FORSYTH CO. NC FEE $26.00
PRESENTED & RECORDED
04/26/2016 03:11:19 PM
C. NORMAN HOLLEMAN
REGISTER OF DEEDS
BY: SANDRA YOUNG
DPTY

BK: RE 3282
PG: 3703 - 3703

RECORDING REQUESTED AND PREPARED BY:                    AND WHEN RECORDED MAIL TO:
WELLS FARGO BANK, N.A.                                  WELLS FARGO BANK, N.A.
MICHELLE CHRIST                                         ASSIGNMENT TEAM
1000 BLUE GENTIAN RD                                    MAC: N9289-016
SUITE 200                                               PO BOX 1629
EAGAN, MN 55121                                         EAGAN, MN 55121-4400

### ASSIGNMENT OF DEED OF TRUST

Submitted electronically by Wells Fargo Home Mortgage in compliance with North Carolina statutes governing recordable documents and the terms of the submitter agreement with the Forsyth County Register of Deeds.
MIN: ███████████████  MERS Phone #: 1-888-679-6377

. For good and valuable consideration, the sufficiency of which is hereby acknowledged, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR ALPHA MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS , P.O. BOX 2026 , FLINT, MI 48501-2026** , by these presents does convey, assign, transfer and set over to: **WELLS FARGO BANK, N.A.** , **1 HOME CAMPUS , DES MOINES, IA 50328** , the following described Deed of Trust, with all interest, all liens, and any rights due or to become due thereon. Said Deed of Trust for $372500.00 is recorded in the State of **NORTH CAROLINA** , County of **Forsyth** Official Records, dated **11/19/2012** and recorded on **11/26/2012** , as Instrument No. **2012052228 00186** in Book No. **3092** , at Page No. **2607** .
Original Trustor/Grantor: **STANLEY B GREEN AND JENNIFER C GREEN, HUSBAND AND WIFE**
Original Beneficiary: **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR ALPHA MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS**
Property Address: **2733 SPRING GARDEN ROAD WINSTON SALEM, NC 27106**
Date: 04/26/2016
**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR ALPHA MORTGAGE CORPORATION, ITS SUCCESSORS AND ASSIGNS**
By:

_[signature]_

SCOTT GERALD HEURKINS, Assistant Secretary
STATE OF MN
COUNTY OF Dakota } s.s.

On **04/26/2016** , before me **MICHELLE ERIN WIHREN** , Notary Public, personally appeared **SCOTT GERALD HEURKINS , Assistant Secretary** personally known to me (or proved to me on the basis of satisfactory evidence), to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument, the person or entity upon behalf of which the person acted, executed the instrument.
Witness my hand and official seal.

_[signature]_
MICHELLE ERIN WIHREN , Notary Public
Commission #: 20307590
My Commission Expires: 01/31/2021

MICHELLE ERIN WIHREN
NOTARY PUBLIC-MINNESOTA
MY COMMISSION EXPIRES 01/31/2021

eRecorded

**EXHIBIT F**

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $300,000.00 | 01-05-2015 | 01-05-2016 | 3887 | 610/205 | | 530 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "*****" has been omitted due to text length limitations.

**Borrower:** Strauch Green & Mistretta, P.C.
530 N. Trade St, Ste 303
Winston Salem, NC 27101

**Lender:** FIRST COMMUNITY BANK
Jonestown
312 Jonestown Road
Winston-Salem, NC 27104
(336) 794-0811

---

**Principal Amount: $300,000.00**                                         **Date of Note: January 5, 2015**

**PROMISE TO PAY.** Strauch Green & Mistretta, P.C. ("Borrower") promises to pay to FIRST COMMUNITY BANK ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Hundred Thousand & 00/100 Dollars ($300,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on January 5, 2016. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning February 5, 2015, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the Wall Street Journal Prime Rate as Published in the Wall Street Journal. (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current index rate upon Borrower's request. The interest rate change will not occur more often than each day, as the Prime Rate changes. Borrower understands that Lender may make loans based on other rates as well. The Index currently is 3.250% per annum. Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 0.500 percentage points over the Index, adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 5.000% per annum based on a year of 360 days. NOTICE  Under no circumstances will the interest rate on this Note be less than 5.000% per annum or more than (except for any higher default rate shown below) the lesser of 18.000% per annum or the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.   Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest.   Rather, early payments will reduce the principal balance due.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: FIRST COMMUNITY BANK, Jonestown, 312 Jonestown Road, Winston-Salem, NC 27104.

**LATE CHARGE.** If a payment is 15 days or more late, Borrower will be charged 4.000% of the unpaid portion of the regularly scheduled payment. This late charge shall be paid to Lender by Borrower to compensate Lender for Lender's extra costs and expenses caused by the late payment.

**INTEREST AFTER DEFAULT.** Upon default, at Lender's option, and if permitted by applicable law, Lender may add any unpaid accrued interest to principal and such sum will bear interest therefrom until paid at the rate provided in this Note (including any increased rate). Upon default, the interest rate on this Note shall be increased by adding an additional 4.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. If judgment is entered in connection with this Note, interest will continue to accrue after the date of judgment at the rate in effect at the time judgment is entered. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**EXPRESS CONSENT FOR PHONE CALLS.** All telephone numbers provided by you may be subject to receiving telephone calls from an automated dialer using a pre-recorded, artificial voice message, or live operator call.  You give your prior express consent to receive such phone calls, including any calls made to your provided cellular telephone number.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

# PROMISSORY NOTE
## (Continued)

Loan No:   8887                                                                                                     Page 2

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of North Carolina without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of North Carolina.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Forsyth County, State of North Carolina.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $15.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

**COLLATERAL.** Borrower acknowledges this Note is secured by a) A UCC recorded with the NC Secretary of State on March 6, 2009 at 6:00pm with File# 20090017249F;

b) A UCC recorded with the NC Secretary of State on June 12, 2012 at 11:52am with File# 20120055003K.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Jack M. Strauch, President of Strauch Green & Mistretta, P.C.; and Stanley B. Green, Secretary of Strauch Green & Mistretta, P.C. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**SUBORDINATION OF DIVIDENDS & DEBT.** Borrower and any Guarantor covenant to Lender that, during the term of the Loan evidenced by the Note, Borrower will subordinate (i) distribution of any of its assets to any shareholder, member, partner, employee or agent for payment of any debt, obligation, dividend, distribution, gift, bonus or otherwise, and (ii) the payment of any other existing or future debt to the payment of the Loan evidenced by the Note.

**POST CLOSING DOCUMENTATION.** Borrower, any Guarantor, and any Grantor agree that, following the closing of the Loan(s) evidenced by this Agreement, Lender is authorized hereby to complete any loan document by the insertion of the appropriate information in any blanks therein and by attaching any exhibits thereto. Borrower, any Guarantor, and any Grantor further agree to re-execute and deliver to the Lender any and all loan documents that do not represent or contain the final version of the terms and conditions of the Loan(s) evidenced by this Agreement. Borrower, any Guarantor, and any Grantor also agree to execute and/or deliver to the Lender any additional documents that are required by Lender to comply with the terms and conditions set forth in this Agreement, all of which documents shall be satisfactory in form and substance to the Lender.

**CROSS DEFAULT.** If any existing or future debt extended by Lender to Borrower, any related company or individual, and any Guarantor is in default, then all other loans and other extensions of credit to the Borrower, all related companies and individuals, and Guarantors will be in default.

**PRIOR NOTE.** Renewal of Lni#   8887 with increase in Line of Credit amount.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Borrower may notify Lender if Lender reports any inaccurate information about Borrower's account(s) to a consumer reporting agency. Borrower's written notice describing the specific inaccuracy(ies) should be sent to Lender at the following address: First Community Bank Loan Operations P. O. Box 5789 Princeton, WV 24740.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

STRAUCH GREEN & MISTRETTA, P.C.

By: _____                                    By: _____
Jack M. Strauch, President of Strauch Green &                  Stanley B. Green, Secretary of Strauch Green &
Mistretta, P.C.                                                                Mistretta, P.C.

LASER PRO Lending, Ver. 13.4.0.004 Copr. Harland Financial Solutions, Inc. 1997, 2013. All Rights Reserved. - NC F:\CFI\LPL\D20.FC TR-51634 PR-14



## CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $300,000.00 | 01-05-2016 | 01-05-2016 | 15887 | 018 / 395 | | BJJ | |

References in the boxes above are for Lender's use only ... and limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

| Borrower: | Strauch Green & Mistretta, P.C. | Lender: | FIRST COMMUNITY BANK |
|---|---|---|---|
| | 530 N. Trade St, Ste 303 | | Jonestown |
| | Winston Salem, NC 27101 | | 312 Jonestown Road |
| | | | Winston-Salem, NC 27104 |
| | | | (336) 794-0911 |

**Principal Amount: $300,000.00**                    **Date of Agreement: January 13, 2016**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** Original note dated January 5, 2015 in the principal amount of $300,000.00.

**DESCRIPTION OF CHANGE IN TERMS.** The current maturity date of January 5, 2016 is being extended. The new maturity date will be March 5, 2016. The interest rate will remain at a variable rate of Wall Street Journal Prime + .50% with a floor of 5.00%. The monthly interest only payment will be due on February 5, 2016 with a final payment for the remaining principal and interest due on March 5, 2016 (the new maturity date).

Borrower must pay any accrued interest due at the time of execution of this agreement.

All other terms and conditions shall remain unchanged.

This Agreement shall be effective as of the 5th day of January, 2016.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation makers, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**CHANGE IN TERMS SIGNERS:**

**STRAUCH GREEN & MISTRETTA, P.C.**

By: _____                    By: _____
Jack M. Strauch, President of Strauch Green &         Stanley B. Green, Secretary of Strauch Green &
Mistretta, P.C.                                        Mistretta, P.C.

X _____                       X _____
Jack M. Strauch, Individually as Guarantor            Stanley B. Green, Individually as Guarantor

**LENDER:**

**FIRST COMMUNITY BANK**

X _____
Authorized Signer

## CHANGE IN TERMS AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| $300,000.00 | 01-05-2015 | 01-05-2016 | 8887 | 018 / 200 | | BJJ | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

| | | | |
|---|---|---|---|
| **Borrower:** | Strauch Green & Mistretta, P.C.<br>530 N. Trade St, Ste 303<br>Winston Salem, NC 27101 | **Lender:** | FIRST COMMUNITY BANK<br>Jonestown<br>312 Jonestown Road<br>Winston-Salem, NC 27104<br>(336) 794-0811 |

---

**Principal Amount: $300,000.00**                                   **Date of Agreement: March 7, 2016**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** Original note dated December 16, 2013 in the principal amount of $200,000.00 and was increased to $300,000.00 on January 5, 2015.

**DESCRIPTION OF CHANGE IN TERMS.** The current maturity date of March 5, 2016 is being extended. The new maturity date will be March 7, 2017. The interest rate will change from a Variable Rate of NY Prime + 0.50% with a Floor of 5.00% to a Fixed Rate of 3.50%. The monthly interest only payment will be due on April 7, 2016 and monthly thereafter, with a final payment for the remaining principal and interest due on March 7, 2017 (the new maturity date).

Borrower must pay any accrued interest due at the time of execution of this agreement.

Borrower also acknowledges they are paying a $300.00 Modification Fee.

All other terms and conditions shall remain unchanged.

This Agreement shall be effective as of the 5th day of March, 2017.

**CONTINUING VALIDITY.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. Consent by Lender to this Agreement does not waive Lender's right to strict performance of the obligation(s) as changed, nor obligate Lender to make any future change in terms. Nothing in this Agreement will constitute a satisfaction of the obligation(s). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement. If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.

**CHANGE IN TERMS SIGNERS:**

**STRAUCH GREEN & MISTRETTA, P.C.**

By: _____
Jack M. Strauch, President of Strauch Green &
Mistretta, P.C.

By: _____
Stanley B. Green, Secretary of Strauch Green &
Mistretta, P.C.                                    *Vice President (SBG)*

X _____
Jack M. Strauch, Individually as Guarantor

X _____
Stanley B. Green, Individually as Guarantor

**LENDER:**

**FIRST COMMUNITY BANK**

X _____
Authorized Signer



## COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|-----------|-----------|----------|---------|-------------|---------|---------|----------|
| | | | | 010 / 285 | | MW | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Strauch Green & Mistretta, P.C.
530 N. Trade St, Ste 303
Winston Salem, NC 27101

**Lender:** FIRST COMMUNITY BANK
Jonestown
312 Jonestown Road
Winston-Salem, NC 27104
(336) 794-0811

**Guarantor:** Stanley B. Green
2733 Spring Garden Road
Winston Salem, NC 27106

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated. However, "Indebtedness" shall not include any liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, unless otherwise agreed in writing by Lender and Guarantor.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any

## COMMERCIAL GUARANTY
### (Continued)

| Loan No.   8887 | Page 2 |
|---|---|

Information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Annual Statements.** As soon as available, but in no event later than one-hundred-twenty (120) days after the end of each fiscal year, Guarantor's balance sheet and income statement for the year ended, prepared by Guarantor.

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a certified public accountant satisfactory to Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty. In addition to the waivers set forth above, Guarantor expressly waives, to the extent permitted by North Carolina law, all of Guarantor's rights under (1) North Carolina General Statutes Sections 26-7 through Section 26-9, or any similar or subsequent laws, (2) North Carolina General Statutes Section 25-3-605 relating to impairment of collateral, or any similar or subsequent law, and (3) North Carolina General Statutes Section 25-9-501 and Section 25-9-504 with respect to the "commercial reasonableness" of any sale of collateral, or any similar or subsequent laws.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of North Carolina without regard to its conflicts of law provisions.

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of Forsyth County, State of North Carolina.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

## COMMERCIAL GUARANTY
### (Continued)

| Loan No | 8887 | | Page 3 |
|---|---|---|---|

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**SUBORDINATION OF DIVIDENDS & DEBT.** Borrower and any Guarantor covenant to Lender that, during the term of the Loan evidenced by the Note, Borrower will subordinate (i) distribution of any of its assets to any shareholder, member, partner, employee or agent for payment of any debt, obligation, dividend, distribution, gift, bonus or otherwise, and (ii) the payment of any other existing or future debt to the payment of the Loan evidenced by the Note.

**POST CLOSING DOCUMENTATION.** Borrower, any Guarantor, and any Grantor agree that, following the closing of the Loan(s) evidenced by this Agreement, Lender is authorized hereby to complete any loan document by the insertion of the appropriate information in any blanks therein and by attaching any exhibits thereto. Borrower, any Guarantor, and any Grantor further agree to re-execute and deliver to the Lender any and all loan documents that do not represent or contain the final version of the terms and conditions of the Loan(s) evidenced by this Agreement. Borrower, any Guarantor, and any Grantor also agree to execute and/or deliver to the Lender any additional documents that are required by Lender to comply with the terms and conditions set forth in this Agreement, all of which documents shall be satisfactory in form and substance to the Lender.

**CROSS DEFAULT.** If any existing or future debt extended by Lender to Borrower, any related company or individual, and any Guarantor is in default, then all other loans and other extensions of credit to the Borrower, all related companies and individuals, and Guarantors will be in default.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Strauch Green & Mistretta, P.C. and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Stanley B. Green, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means FIRST COMMUNITY BANK, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED DECEMBER 10, 2013.**

**GUARANTOR:**

X _____
Stanley B. Green

## COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No. | Call / Coll | Account | Officer MW | Initials |
|---|---|---|---|---|---|---|---|
| | | | | 016 / 265 | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Strauch Green & Mistretta, P.C.  
530 N. Trade St, Ste 303  
Winston Salem, NC 27101

**Lender:** FIRST COMMUNITY BANK  
Jonestown  
312 Jonestown Road  
Winston-Salem, NC 27104  
(336) 794-0811

**Guarantor:** Stanley B. Green  
2733 Spring Garden Road  
Winston Salem, NC 27106

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, reasonable attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated. However, "Indebtedness" shall not include any liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, unless otherwise agreed in writing by Lender and Guarantor.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written revocation of this Guaranty is effective only upon receipt by Lender, so written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any

**EXHIBIT G**

FILED

ORTH CAROLINA                2013 JUN 24  AM 9: 07  THE GENERAL COURT OF JUSTICE
                                         )                    DISTRICT COURT DIVISION
FORSYTH COUNTY              FORSYTH CO., C.S.C.          13 CVD 3750

JENNIFER CLELAND GREEN,          CS    )
                    BY._____)
        Plaintiff,                         )
                                           )         ORDER FOR PRELIMINARY
v.                                         )              INJUNCTION
                                           )
STANLEY B. GREEN,                          )
                                           )
        Defendant.                         )

---

THIS CAUSE coming on to be heard by the undersigned Judge Presiding on Plaintiff's Motion for a Preliminary Injunction as set forth in her Complaint, this Court's June 14, 2013 Temporary Restraining Order (ED) and this Court's June 14, 2013 Temporary Restraining Order (ESI); and, it appearing that Plaintiff is represented by Robin J. Stinson, attorney of the law firm BELL, DAVIS & PITT, P.A., Winston-Salem, North Carolina, and that Defendant is represented by Gary B. Tash, attorney of the law firm of TASH & KURTZ, PLLC, Winston-Salem, Forsyth County, North Carolina;

AND IT APPEARING TO THE COURT that this Court has jurisdiction over the parties hereto and the subject matter of this case; and that the provisions of N.C. Gen. Stat. § 50-20(i) make the entry of this Order appropriate to prevent the disappearance, waste, or conversion of marital property and to preserve the status quo thereof;

AND IT FURTHER APPEARING TO THE COURT that the parties consent to the entry of this Order of Preliminary Injunction as represented by the signature of their respective counsel affixed hereto and that the parties, through counsel, waive further Findings of Fact and Conclusions of Law;

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Defendant and his agents, officers, and directors are temporarily restrained and enjoined as follows:

1.     Pending further orders of this Court, Plaintiff Jennifer Cleland Green and Defendant Stanley B. Green each are hereby restrained from disposing of, transferring, selling, encumbering, trading, or altering any of the marital, divisible, or separate assets of the parties or any of their assets, including but not limited to bank and brokerage accounts, motor vehicles, gun collections, stock, retirement funds and other assets, except as necessary to pay the reasonable and ordinary living expenses of the parties, to pay attorney fees, and for Defendant to operate his law firm in the ordinary course of business.

2.      Pending further orders of this Court, Defendant Stanley B. Green, his employees (if any) and agents, are each prohibited from concealing, altering, deleting, erasing, reformatting, or disposing of information, data compilations, metadata, computerized data or other electronically or digitally recorded information maintained in digital or electronic storage devices including, but not limited to, computers, laptop computers, online electronic storage, back-up tapes, or CD's or other removable storage devices, personal digital assistance (PDA's), cellular telephones, iPads or other similar electronic notepads, electronic mail, or any and all such other electronically stored information pertaining to any communications between Defendant Stanley B. Green and Dawn Mistretta for the period June 1, 2012 until this Order of Preliminary Injunction is amended or vacated.

3.      Defendant, his agents and employees, shall take all necessary steps to inform the employees of Defendant's law firm of the existence and application of this Order of Preliminary Injunction and to ensure that Defendant's law firm and its employees comply with the prohibitions of this Order including refraining from concealing, altering, destroying, modifying, or deleting documents, data, data compilations, electronic mail or other computer or electronically generated information regarding any of the areas identified in paragraph 2 herein.

4.      Upon entry of this Order, Defendant shall deliver to Derek Ellington of Ellington IT & Forensics his laptop computer, his I-Phone and his I-Pad; Derik Ellington is then directed to make a forensic image of the hard drive of each device and thereafter to hold the forensic image in trust pending further discovery hearings to be conducted in this matter. The delivery shall be made at the law offices of Tash & Kurtz in Winston-Salem, North Carolina on Monday, June 24, 2013 at 3 p.m. Any copies of information obtained by Ellington and provided to Plaintiff shall also be provided to Defendant. The production of said information shall in no way constitute a waiver of any attorney-client privilege.

5.      It is further ordered that neither Plaintiff nor Defendant is required to post any bond with the Clerk of Superior Court of Forsyth County, North Carolina.

6.      This Preliminary Injunction Order shall remain in effect pending further orders of the Court upon motion by either party for review and proper notice of calendaring for review. An equitable distribution judge will hear any and all issues involving this Order.

7.      It is further ordered that willful violation of this Order shall be punishable as for contempt.

This 24th day of June 2013 at 8:55 a.m.

_____
District Court Judge Presiding

CONSENTED TO:

_____
Robin J. Stinson
Attorney for Plaintiff

_____
Gary B. Tash
Attorney for Defendant